IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>EAGLE PIPE, LLC,[1]<br><br>Debtor. | § §  Chapter 11<br>§ §  Case No. 20-34879 (MI)<br>§ § |

**DECLARATION OF JARED LIGHT IN SUPPORT OF EAGLE PIPE, LLC'S
CHAPTER 11 PETITION AND FIRST DAY RELIEF**

Jared Light declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

**INTRODUCTION**

1. My name is Jared Light. I am over the age of eighteen, and am fully competent to make this Declaration. I have never been convicted of a felony or crime of dishonesty or moral turpitude.

2. I am the President of Eagle Pipe, LLC ("Eagle Pipe" or the "Debtor"), the debtor and debtor-in-possession in the above captioned case (the "Case"). I previously served as the Chief Operating Officer from 2013 until 2020, when I was promoted to President.

3. As the President, I am familiar with the Debtor's operations, books and records and business plans. I have personal knowledge of the facts stated herein, or such facts are based on my review of the Debtor's operations, including the Debtor's books and records, and on the information and interviews conducted by me and my staff and professional advisors with the Debtor's officers, members, and employees.

---

[1] The last four digits of Debtor's federal tax identification number are (1119).

013017.4835-8467-9629.4

4. I submit this Declaration in support of the various motions discussed below (the "First Day Motions") that the Debtor is filing on or shortly after the commencement of the Case on October 5, 2020 (the "Petition Date").

## BACKGROUND

**A.  Debtor's History and Business**

5. Formed in 2013, the Debtor is a full-service distributor and supply-chain logistics provider for oil country tubular goods ("OCTG"), Line Pipe, and HDPE ("Poly Pipe"), as well as a wide variety of associated products and services to the upstream, midstream, and municipal & industrial industries. Since 2013, the Debtor has brought an innovative approach to the OCTG, Line Pipe & Poly Pipe distribution business. Using unmatched proprietary analytics, coupled with enhanced supply models, the Debtor is a market-leading full-service distribution company for OCTG and Line Pipe & Poly Pipe, and is also an authorized distributor for world-class tier-1 domestic pipe mills and product manufacturers. The Debtor employs a complete supply model, provides a comprehensive scope of OCTG, Line Pipe & Poly Pipe products and value-added services. Additionally, the Debtor's strategically located stocking yards include service and freight infrastructure throughout the United States. The Debtor's experienced team takes an individual approach per each unique customer, providing custom-tailored industry solutions delivering maximum results. Over the past decade, the Debtor became the go-to choice for even the most dynamic operators in across multiple industries.

6. Eagle Pipe's application of its proprietary business models has resulted in being named to the Inc. 5000 list of fastest growing companies in the USA 3 years in a row, climbing the ranks each year, and most recently being recognized as #466 on the Inc. 5000 list for 2020. Moreover, the Debtor has been recognized by Inc. Magazine as the #15 fastest growing company

in the State of Texas in 2020. The Debtor has also been recognized as the #17 fastest growing middle market company in Houston by the Houston Business Journal in their recently released 2020 rankings. Additionally, the Debtor's dedication to its employees and its focus on creating a positive and inclusive work environment resulted in Eagle Pipe being named one of the Best Places to Work in the USA in 2020 by Inc. Magazine. The Debtor's management team has been recognized by Oil & Gas Investor Magazine as a Top 40 Under 40 Executive. The Debtor's CEO was awarded EY Entrepreneur of the Year for both the Gulf Coast Region, as well as nationally, in 2019.

7. However, the Debtor, like so many others in the industry, was hampered by the shifting consumer demands for oil and gas products in the wake of the COVID-19 pandemic. As the market saw sharp reductions in production activities, the Debtor saw immediate and sharp declines in demand for its products and services.

8. Before the economic downturn over the past several months, the Debtor employed over 25 employees at the corporate offices and field locations. As of the Petition Date, the Debtor employed approximately 19 active and full-time employees (collectively, the "Employees").

9. The Debtor is a closely held limited liability company organized under the laws of Texas. I own approximately 39.6% of the membership interests of the Debtor, co-founder and CEO Brandon Dewan owns approximately 50.5%. Jordan Kestenbaum owns the remaining 9.9% membership interests but is not an officer, director or person involved in the day-to-day decision making or management of the Debtor.

**B.  The Debtor's Prepetition Capital Structure**

10. The Debtor, as borrower, is party to that certain Loan and Security Agreement, U.S. Bank N.A., dated April 6, 2018 (including all amendments, the "Loan Agreement"), with certain

lender parties thereto (the "Lenders") and U.S. Bank National Association as administrative agent thereunder ("U.S. Bank" or "Agent"). In connection with the Loan Agreement, the Debtor executed that certain Revolving Loan Note dated April 6, 2018 (the "Note") in favor of the Agent, as payee, with the principal amount of $55 million.

11. On December 21, 2018, the parties amended the Loan Agreement to increase the principal amount of the Note to $65 million. On May 24, 2019, the parties further amended the Loan Agreement to (i) increase the principal amount of the aggregate commitment to $100 million and (ii) add PNC Bank, National Association ("PNC Bank") as a Lender.[2] As of the Petition Date, approximately $20.7 million was believed to be outstanding under the Loan Agreement.

12. Pursuant to the Loan Agreement, Lenders claim a first-priority security interest in all of the Debtor's Cash Collateral, including its cash, accounts and inventory. As of the Petition Date, the Debtor had approximately $808,000 in cash, approximately $10 million in accounts receivable, and approximately $30 million in OCTG and Line Pipe inventory. Of the $30 million in OCTG and Line Pipe inventory, the Debtor has received notice from two different parties – Boomerang Tube, LLC ("Boomerang") and Centric Pipe, LLC ("Centric" and, collectively with Boomerang, the "Claimants") – asserting an interest in approximately $11 million of such inventory. The Debtor disputes Claimants' interest in the OCTG inventory, and, to the extent the disputes cannot be resolved amicably, the Debtor reserves all rights under applicable bankruptcy and non-bankruptcy law to pursue and recover such inventory for the benefit of the estate and its creditors.

---

[2] Of the $100 million aggregate commitment, U.S. Bank agreed to lend up to $55 million and PNC Bank agreed to lend up to $45 million. Such commitments were reduced to an aggregate of $25 million prior to the Petition Date by amendment to the Loan Agreement.

013017.4835-8467-9629.4

13. Prior to the Petition Date, the Agent notified the Debtor of a number of occurrences and continuances of Events of Default. Notwithstanding such Events of Default, the Lenders have continued to consent to the Debtor's continued operations prior to the Petition Date and, on information and belief, the Lenders will agree to continued use of cash collateral, provided the Court approves the terms of an interim and final order on the Debtor's motion to use cash collateral, discussed below.

C. **Events Leading Up to the Bankruptcy Filing**

14. As noted above, no single factor did more harm to the Debtor's business than the economic downturn in the wake of the COVID-19 pandemic. As drilling activity declined in the Spring and Summer of 2020 to account for changes in consumer demands, one of the Debtor's largest customers, XTO Energy Inc. ("XTO"), terminated its relationship with the Debtor on or about June 29, 2020. At the time, XTO represented a substantial portion—approximately 50%—of the Debtor's revenues. More importantly, when XTO terminated the parties' arrangements, it also cancelled all pending orders, including an order to deliver 140,000 tons of OCTG, estimated to generate approximately $225 million in revenue for the Debtor. XTO allowed Eagle Pipe to take back obsolete inventory from XTO's stock, in exchange for future orders. Eagle Pipe honored its portion of this agreement and lost substantial revenues selling this XTO inventory into the market, only to have XTO cancel roughly half of the future orders that XTO had awarded Eagle Pipe.

15. In the wake of XTO's cancellation, the Debtor explored options to address its obligations to suppliers for the OCTG that XTO declined to purchase. Two such suppliers—Centric and Boomerang—took steps in subsequent weeks and months to repossess certain inventory as a means to satisfy the Debtor's prepetition obligations. Centric claims to have taken

5

title to approximately $5.5 million of the Debtor's products as payment for approximately $1.5 million in outstanding invoices. As noted above, the Debtor is investigating Centric's position and any claims that may be pursued against Centric to maximize recoveries for the benefit of the Debtor's creditors and bankruptcy estate.

16. Boomerang, on the other hand, filed a lawsuit against the Debtor and myself on October 2, 2020, styled *Boomerang Tube, LLC v. Eagle Pipe, LLC, Beemac, Inc. and Jared Light,* Cause No. 2020-62174, in the 189th Judicial District of Harris County, Texas (the "State Court Lawsuit"). According to the State Court Lawsuit, Boomerang alleges that the Debtor either transferred inventory to Boomerang on or about July 7, 2020, to satisfy antecedent debt of approximately $7 million, or that the Debtor promised to make such transfers, but failed to do so and still owns title to such inventory. Late in the evening of Friday, October 2, 2020, I received notice that a temporary restraining order was entered against the Debtor and me, on an *ex parte* basis. The Debtor and its professionals are reviewing the allegations asserted by Boomerang in the State Court Lawsuit and will take whatever steps are necessary to maximize recoveries for the bankruptcy estate and its creditors.

17. These transfers alleged by Centric and Boomerang are included in the Lenders' notice of default and were additional factors leading to the filing of this Case.

**D.     Goal of the Bankruptcy Case**

18. Through this Case, the Debtor intends to sell substantially all of its assets to the highest bidder under a Court-approved sale process, to be proposed within the first few days of this Case. Before the Petition Date, the Debtor engaged in negotiations with one of its customers, Marco International Corporation ("Marco"), to sell all or substantially all of the Debtor's assets. On information and belief, the parties have reached an agreement in principal on business and

financial terms. In the interest of full disclosure, Marco is an existing customer of the Debtor, and there exists an attenuated affiliation between Marco and the Debtor based on the Debtor's minority member—JEK, LLC—whose principal is Jordan Kestenbaum. Mr. Kestenbaum is also a director of Marco. As explained above, Mr. Kestenbaum is not involved in the Debtor's day-to-day operations, but Marco is a strategic player in the industry that brings potential value to the Debtor and its creditors.

19. It is the Debtor's intention to file a motion to approve bidding procedures and stalking horse protections as soon as possible, and preferably by October 9, 2020, which motion will seek to run an expedited marketing process, with the assistance of the Debtor's financial advisors. The Lenders have requested such marketing to be completed by mid-November, the transaction approved by the end of November and the transaction closed by mid-December. The Debtor believes that such timing if feasible, and that such a process and transaction will generate the maximum value for the Lenders and the estate's other creditors. Such a transaction with Marco will also ensure that the Debtor's remaining employees will continue to be employed by Marco.

## FIRST DAY MOTIONS

### A. Complex Case Designation

20. The Debtor has filed a Notice of Designation as a Complex Chapter 11 Bankruptcy Case. I am informed and believe this chapter 11 case qualifies for complex case treatment because (a) the total claims asserted against the Debtor exceeds $10 million, and (b) there are approximately 40-50 creditors and parties in interest in this Case. As a result, the Debtor has a need to simplify notice and hearing procedures, to reduce delays and expenses.

**B.     Cash Collateral Motion**

21.     The Debtor has filed an *Emergency Motion for Interim and Final Orders (I) Authorizing the Debtor to Use Cash Collateral; (II) Granting Adequate Protection; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* (the "Cash Collateral Motion").  The Cash Collateral Motion includes a proposed budget (the "Budget") which contemplates use of cash collateral over a 13-week period.  The Lenders hold pre-petition liens in all cash, accounts and inventory (as defined in the Cash Collateral Motion, "Cash Collateral").

22.     The Debtor cannot operate without authority to utilize Cash Collateral during the course of this Case.  As reflected in the Budget, the Debtor must pay its vendors, taxing authorities, insurance financiers and employees during the course of this Case to maintain operations as a going concern, which I believe will be a condition precedent to Marco's obligation to purchase the Debtor's assets.  Some of these obligations come due within the first few days of the Case, and the Debtor would suffer irreparable harm if those payment, such as payroll, critical vendor, insurance and tax obligations, are not made timely.

23.     As reflected in the Budget, the Debtor will not need to borrow funds as long as Marco is willing to pre-pay part of its $2.7 million accounts receivable as necessary to fund any operational shortfalls during the Case.  On information and belief, Marco is willing to, and intends to, do so.

24.     The proposed terms for use of Cash Collateral were negotiated at arms' length among the Debtor's and Lenders' professionals.  Such relief includes covenants regarding minimum cash balances, maximum accounts payable, sale price thresholds and maximum disbursements during the interim period.  The Debtor has also agreed to provide replacement liens on existing collateral and unencumbered collateral, superpriority claims and weekly reporting.

8

The proposed order also contemplates milestones for the sale process with Marco. On information and belief, the Lenders would not consent to the Debtor's use of Cash Collateral without such adequate protection. The terms negotiated are fair and reasonable under the circumstances and should be granted on an interim and, after final hearing, a final basis.

**C.  Employee Wages and Benefits Motion**

25.  The Debtor also filed its *Emergency Motion for Entry of an Order (I) Authorizing the Debtor to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation and (B) Maintain Employee Benefit Programs, and (II) Directing Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment and to Honor All Fund Transfer Requests Related Thereto* (the "Employee Wages and Benefits Motion"), seeking authority to pay prepetition wages and honor any prepetition benefits.

26.  The Debtor's 19 Employees are paid every two weeks (bi-weekly).[3] The Debtor's average bi-weekly payroll totals approximately $118,537.79. It is critically important that the Debtor be able to continue to compensate its employees on the historical payroll schedule, and this requires the services of Insperity, Inc. ("Insperity")[4] or such other third party service provider the Debtor may retain.

27.  As of the Petition Date, the Debtor has a payroll due on October 9, 2020, which covers the pay period of September 21 to October 4, 2020. The approximate amount of accrued and unpaid wages earned prior to the Petition Date is $118,537.79.

28.  In order to ensure that Insperity receives the funds necessary to meet the October 9, 2020 payroll, the Debtor must transfer the funds to the appropriate bank account for such payroll no later than October 7, 2020.

---

[3]  Bi-weekly, as described by the Debtor, means a total of twenty-six (26) payments in one calendar year.
[4]  Insperity serves as the professional employer organization handling payroll for the Debtor.

013017.4835-8467-9629.4

29. The Debtor estimates that the prepetition payroll taxes and other withholding payments associated with the unpaid prepetition payroll total approximately $20,168.14.[5]

30. In the ordinary course of business, the Debtor makes various benefit plans available to its Employees, medical, dental, vision, prescription drug benefits, health savings accounts, flexible spending accounts, workers' compensation benefits, as well as other miscellaneous benefits ("Benefits Programs").[6]

31. The Debtor recognizes certain holidays as a paid time-off benefit for its employees. Employees are not entitled to cash payments for holidays. Thus, the Debtor does not believe there are any obligations owing as of the Petition Date on account of holidays.

32. Employees are covered under the Debtor's medical, dental, and prescription drug plans; which are administered by UnitedHealthcare, and the Debtor's vision plan, which is administered by VSP. Both the medical plan and the dental plan are fully-insured plans. The Debtor also covers the cost of certain life insurance plans, administered by John Hancock for me, Banner Life Insurance for Brandon Dewan ("Dewan"), and Mutual of Omaha for Adam Tesanovich ("Tesanovich").

33. The Debtor pays approximately $24,593.42 per month in the aggregate on account of its Benefits Programs. As of the Petition Date, the Debtor estimates that approximately $11,350.81 is accrued and outstanding on account of the Benefits Programs, all of which will become due within the first 21 days of the chapter 11 case. The Debtor seeks authority to pay in a manner consistent with historical practice any unpaid amounts on account of the Benefits

---

[5] These withholdings include federal taxes for income, Social Security, and Medicare, as well as state taxes in Colorado and Oklahoma for a few employees.

[6] The miscellaneous benefits include those benefits not paid for by the Debtor but offered as benefit packages by Insperity: life insurance; personal accidental insurance; short-term and long-term disability insurance; adoption assistance; commuter benefits; 529 college savings plan information; training and development; Employee service center web-based self-service platform; and payroll direct deposit/e-paystub services.

10

Programs and to continue administering the Benefits Programs in the ordinary course of business and consistent with past practice.

34. The Debtor provides workers' compensation insurance for its Employees as required by applicable law. To the extent the Debtor owes any prepetition amounts on account of the administration fees under this program, it hereby seeks authority to pay such amounts in the ordinary course. The Debtor also does not believe that it currently has any workers' compensation claims outstanding

35. The Debtor provides a vehicle allowance to Mr. Dewan and myself, as part of our compensation and benefits. Each allowance is paid once on the first bi-weekly pay schedule of each month, in the approximate amount of $1,321.87. As of the Petition Date, the Debtor estimates that approximately $2,643.74 is accrued and outstanding to be paid Mr. Dewan and myself, in the amount of $1,321.87 each. Mr. Dewan and I depend on this reimbursement as part of our compensation, and it would create an unnecessary hardship to us if these amounts were withheld during the course of this Case.

36. In the ordinary course of business, the Debtor reimburses employees for certain expenses, including travel, car rental, lodging, cellular telephones, health memberships, and tolls. The majority of reimbursable expenses are paid directly by the employees. The Debtor pays approximately $1,335.89 per month on account of reimbursable expenses. Based on historical practice, the Debtor estimates that, as of the Petition Date, Employees were owed roughly $4,668.64 in unpaid reimbursable expenses (including reimbursable expenses for which employees have not yet requested reimbursement).

37. The Debtor also provides certain Employees with corporate credit cards (the "Purchase Cards") for business-related purchases. The Purchase Cards have historically been

provided through American Express ("AMEX"). Currently, approximately 11 Purchase Cards are used by Employees. In the three months prior to the Petition Date, the Debtor paid approximately $55,000.00 on account of the Purchase Cards on a monthly basis, and $100,000.00 per month in the nine months prior to that period. As of the Petition Date, approximately $35,000.00 is outstanding on account of the Purchase Cards. The Debtor seeks authority to honor such outstanding prepetition obligations in the ordinary course of business and consistent with past practice and to continue paying any such obligations related thereto in the ordinary course of business on a postpetition basis.

38. Employees have incurred reimbursable expenses as business expenses on the Debtor's behalf and with the understanding that the Debtor would reimburse them. It would create a hardship on the Employees who incurred reimbursable expenses, and who may become personally liable for such expenses reasonably incurred at the Debtor's direction, if the Debtor was unable to make payments to either the Employees or to the applicable credit card company or account of any reimbursable expenses that accrued prepetition and were incurred in the ordinary course of business in furtherance of the Debtor's business.

**D. Tax Payment Motion**

39. The Debtor has also filed the *Emergency Motion Authorizing the Payment of Certain Prepetition Taxes and Fees and Granting Related Relief* (the "Tax Payment Motion"). In the ordinary course of its business, the Debtor collects, withholds, and incurs sales, use, excise, income, withholding, franchise, and property taxes, as well as other business, environmental, and regulatory fees (collectively, the "Taxes and Fees"). The Debtor remits the Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities (collectively, the "Authorities").

013017.4835-8467-9629.4

40. In connection with such operations, the Debtor incurs, collects, and remits sales and use taxes based on the goods and/or services that are used or consumed and assessed in relation to the value added to such goods and/or services (the "Sales and Use Taxes"). Sales and Use Taxes essentially are general consumption taxes charged at either the point of purchase for goods and services or the point of sale of goods and services, which are usually set by the Authority as a percentage of the retail price of the good or service purchased. The process by which the Debtor remits Sales and Use Taxes varies depending on the Authority. Generally, the Debtor remits Sales and Use Taxes on a monthly, bi-monthly or quarterly basis. In 2019, the Debtor remitted approximately $8,573,863.00 in the aggregate to various Authorities on account of Sales and Use Taxes. The Debtor estimates that approximately $41,737.00 will be due this month on account of Sales and Use Taxes, most or all of which accrued before the Petition Date.

41. The Debtor, in the ordinary course of business, collects and holds state income taxes in trust for the benefit of the applicable Authorities. By the Tax Payment Motion, the Debtor seeks authority, but not direction, to pay approximately $10,000 in income taxes that have accrued before the Petition Date, and to continue paying income taxes on a postpetition basis in the ordinary course of business.

42. State and local laws in the jurisdictions in which the Debtor operates generally grant Authorities the power to levy property taxes (the "Property Taxes") against the Debtor's real and personal property. To avoid the imposition of statutory liens on its real and personal property, the Debtor typically pays property taxes in the ordinary course of business on an annual or semi-annual basis. During the financial year ending in 2019, the Debtor paid approximately $303,212.00 in Property Taxes to the applicable Authorities. This amount includes Property Taxes collected from third parties and paid to the applicable Authorities. By the Tax Payment Motion, the Debtor seeks

authority, but not direction, to pay any property taxes that have accrued before the Petition Date, and to continue paying property taxes on a postpetition basis in the ordinary course of business. While not due immediately, I estimate that the Debtor will have to pay $400,000 in Property Taxes by January 31, 2021.

**E.     Insurance Premium Finance Motion**

43.     The Debtor filed the *Emergency Motion to Perform Under an Insurance Premium Finance Agreement* (the "Premium Finance Motion") to authorize payments under a pre-petition premium finance agreement necessary to obtain insurance for the Debtor's business. In the ordinary course of its business, the Debtor maintains an umbrella insurance policy with Lloyd's of London; a liability insurance policy with Scottsdale Insurance Company; and a property insurance policy with Roberts Armytage & Partners (the "Policies"). The Debtor obtained the Policies prior to the Petition Date through its insurance broker, Hub International Gulf South ("Broker"), and financed them through a payment plan with First Insurance Funding ("Payment Plan"). The Debtor was unable to pay the total price of premiums in cash up front, hence its use of a Payment Plan. If the Debtor is unable to perform under the Payment Plan, the Policies would terminate and the Debtor would then be required to obtain replacement insurance on an emergency basis and likely at a substantial incremental cost to the estates. As a result, in order to maintain adequate insurance coverage under the Policies, it is necessary for the Debtor to perform under the Payment Plan, which payments are included in the proposed Budget attached to the Cash Collateral Motion.

**F.     Critical Vendor Motion**

44.     The Debtor has also filed the *Emergency Motion for Authority to Pay or Honor Prepetition Obligations to Certain Critical Vendors* (the "Critical Vendor Motion"). In the ordinary course of business, the Debtor depends on certain vendors (the "Vendors") for the

provision of certain services related to the Debtor's operations. The Debtor utilizes an assortment of vendors, including manufacturers of pipe and accessories, storage, freight, material handling, pipe services (e.g., coating and threading), information technology and professionals. Each of these vendors assist the Debtor in its storage and distribution of OCTG and thus directly impact the Debtor's ability to earn revenue.

45. To determine which vendors are most essential to operations, management for the Debtor thoroughly reviewed our accounts payable and pre-petition vendors using the following criteria:

> a. whether the vendor in question is a "sole-source" or "limited source" provider;
>
> b. the costs and delay associated with identifying and qualifying a replacement;
>
> c. whether the Debtor receive advantageous pricing or other terms from a Vendor such that replacing the Vendor post-petition would result in significantly higher costs to the Debtor; and
>
> d. the overall impairment on the Debtor's operations that would result if the particular Critical Vendor ceased or delayed services.

46. Based on the foregoing considerations, the Debtor, in consultation with our professionals and the Lenders' professionals, were able to identify certain vendors ("Critical Vendors"), whose cessation of services would cripple the Debtor's operations, resulting in immediate and irreparable harm to the Debtor and its bankruptcy estate.

47. By the Critical Vendor Motion, the Debtor requests entry of interim and final orders authorizing, but not directing, the Debtor, in its discretion, to preserve these relationships by paying approximately $560,000 on an interim basis for the first four weeks, and up to $1,650,000 in the aggregate, on a final basis over the entirety of the Case. If approved, the Debtor has included these installment payments in the Budget attached to the Cash Collateral Motion. The Debtor will

use its business judgment to pay only such amounts are necessary to ensure the continuity of operations, provided the Critical Vendors honor the terms of the proposed order, including execution of an acceptable trade agreement or such other provisions as the Court may require.

**G.     Cash Management Motion**

48.     The Debtor utilizes a cash management system that provides well-established and efficient mechanisms for the collection, concentration, management, and distribution of funds used in its operations (the "Cash Management System"). The Debtor's Cash Management System constitutes an ordinary course, essential business practice providing significant benefits to the Debtor including, among other things, the ability to (i) control funds, (ii) ensure the availability of funds when necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.

49.     The Cash Management System is comprised of a total of four bank accounts (the "Bank Accounts") held at U.S. Bank.

50.     All loan advance requests are deposited into the Debtor's account ending "4081" (the "Operating Account"). The Operating Account is also used for disbursements and sweeps against the Debtor's account ending "4099" (the "Payroll Account"), which is used to fund payroll for the Debtor's employees. The Payroll Account is a zero balance account. All customer and other receipts are deposited into the Debtor's account ending "4149" (the "Special Depository Account"). The Special Depository Account is a "lockbox" account. Finally, Debtor's account ending "7166" (the "PPP Account") was set up for the deposit of loan proceeds from PNC Bank, National Association under the Paycheck Protection Program (the "Program") established pursuant to the Coronavirus Aid, Relief, and Economic Security Act, as well as disbursements allowable under the Program.

51. Prior to the Petition Date, U.S. Bank swept the Special Depository Account daily. The Debtor made requests to U.S. Bank for funds, and then funds were wired into the Operating Account. Substantially all disbursements by the Debtor were paid from the Operating Account.

52. The Debtor pays U.S. Bank monthly, quarterly or annual fees incurred in connection with the Bank Accounts (the "Bank Fees").  The Bank Fees total approximately $36,000 per year.

53. In addition to the bank accounts, the Debtor utilizes multiple electronic and physical business forms in the ordinary course of their business, including, but not limited to, letterhead on invoices and stationary, and computer-printed checks (the "Business Forms"). By virtue of the nature and scope of the business in which the Debtor is engaged and the numerous other parties with whom they deal, the Debtor needs to use its existing business forms without alteration or change.

## CONCLUSION

54. For the reasons provided above, and after due consideration, it is my business judgment and the business judgment of the Debtor that the First Day Motions and related relief should be granted as described in this Declaration and the motions described herein.

[*Remainder of the page left blank; Signature to follow*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, on this 6th day of October, 2020.

          */s/ Jared Light*
          Jared Light, President