# EXHIBIT A

# MASTER GOODS AND SERVICES AGREEMENT

**Enabling Articles of the Agreement ("Articles")**

This Master Goods and Services Agreement ("Agreement") is made as of 6/20/2019 by and between: XTO Energy Inc. and its affiliates, Barnett Gathering, LLC; English Bay Pipeline, LLC; Fayetteville Gathering Company; Mountain Gathering, LLC; Nesson Gathering System, LLC; Ringwood Gathering Company; Trend Gathering & Treating, LLC; and Timberland Gathering & Processing Company, LLC (individually or collectively, as the circumstances dictate, "Purchaser") And "Supplier": Boomerang Tube, a LLC

1. *General Description of Goods or Services.* "Goods" and "Services" shall be as follows:

    Manufacture of OCTG

2. *Attachments.* **If applicable, the Attachments marked below are incorporated into each Order issued under this Agreement "Attachments"):**

   ☒   1 – Drug, Alcohol, Vehicle Search and Contraband Policy
   ☒   2 – Safety, Health and Environmental Policy
   ☒   3 – Equal Employment Opportunity, Certification of Non-segregated Facilities, and Employment of Qualified Disabled Individuals and Veterans

3. *Notices.* Questions, information, and any notices under this Agreement must be directed to the following addresses. Notices regarding this Agreement by one party to the other shall be in writing and either deposited in the United States mail with first class postage prepaid, delivered in person or by private prepaid courier, or sent by email or facsimile with confirmation. Either Purchaser or Supplier may change its address below by written notice to the other party.

**Purchaser:** XTO Energy Inc. or its listed affiliates   **Supplier:** Boomerang Tube LLC

**Address:** 22777 Springwoods Village Pkwy   **Address:** 14567 North Outer Forty

**City, State, Zip:** Spring, TX 77389   **City, State, Zip:** Chesterfield MO 63017

**Attn:** Master Contracts Group - Kristi Shelton   **Attn:** Kelly Hanlon

**E-Mail:** kristi_shelton@xtoenergy.com   **E-Mail:** kelly.hanlon@boomerangtube.com

4. *Purpose and Operation.* This Agreement consists of the Articles, the General Terms and Conditions, and the Attachments. The purpose of the Agreement is to provide terms and conditions to be incorporated into orders, whether one or more, that may be issued by Purchaser for Goods or Services from Supplier ("Orders"). Each Order will incorporate the terms of the General Terms and Conditions and the designated Attachments. This Agreement shall govern the purchase by Purchaser of Goods and Services, including services related to the manufacture and/or supply of Goods, services performed by Supplier related to such manufacture and/or supply of Goods including but not limited to the installation, replacement, repair or removal of Goods (whether on a Work Site or otherwise), and any other services performed by Supplier at a location other than a Work Site.

5. *No Exclusivity or Minimums.* This Agreement does not require exclusivity of business dealings by either party or commit any Purchaser to purchase any specific amount of Goods or Services.

6. *Early Termination.* This Agreement may be terminated by either Purchaser or Supplier upon at least 30 days prior written notice to the other party. Termination of the Agreement does not affect the rights and obligations of Purchaser and Supplier under any outstanding Orders.

7. *Governing Law.* The validity and interpretation of this Agreement will be governed by the laws of the State of Texas, without reference to that State's principles of conflicts of law. The parties hereby agree to submit to the exclusive jurisdiction of the courts of Texas, including municipal, state and/or federal courts as appropriate, with respect to any dispute arising out of this Agreement.

8. *Entire Agreement; Amendment; Assignment.* This Agreement, including these Articles, the General Terms and Conditions, the Attachments and any Order(s), constitutes the entire agreement between Supplier and Purchaser concerning the subject matter hereof. This Agreement supersedes all prior negotiations, representations, or agreements, either oral or written, related to this Agreement, except a Master Services Agreement, if applicable, between Supplier and Purchaser, which shall always take precedence in connection with services performed on a Work Site. Any amendment to this Agreement must be agreed in writing by Purchaser and Supplier. Supplier shall not assign this Agreement, in whole or in part, without the prior written approval of Purchaser.

| Purchaser: | | Supplier: Boomerang Tube LLC | |
|---|---|---|---|
| XTO Energy Inc. | | | |
| By: | *[DocuSigned by: Anthony Landry, C58DB69567AB457...]* | By: | *[DocuSigned by: Kelly Hanlon, 255DED276E8A4ED...]* |
| Print Name: | Anthony Landry | Print Name: | Kelly Hanlon |
| Title: | Master Contracts Supervisor | Title: | VP of Sales and Marketing |
| Date: | June 20, 2019 | Date: | 6/20/2019 |
| | | Federal Tax I.D. #: | 20-8999415 |

| Purchaser: Barnett Gathering, LLC | | Purchaser: Trend Gathering & Treating, LLC | |
|---|---|---|---|
| By: | *[DocuSigned by: Anthony Landry, C58DB69567AB457...]* | By: | *[DocuSigned by: Anthony Landry, C58DB69567AB457...]* |
| Print Name: | Anthony Landry | Print Name: | Anthony Landry |
| Title: | Master Contracts Supervisor | Title: | Master Contracts Supervisor |
| Date: | June 20, 2019 | Date: | June 20, 2019 |

**Purchaser: English Bay Pipeline**
**Fayetteville Gathering Company**
**Mountain Gathering, LLC**
**Nesson Gathering System, LLC**
**Ringwood Gathering Company**
**Timberland Gathering & Processing Company**

| By: | *[DocuSigned by: Anthony Landry, C58DB69567AB457...]* |
|---|---|
| Print Name: | Anthony Landry |
| Title: | Master Contracts Supervisor |
| Date: | June 20, 2019 |

**GENERAL TERMS AND CONDITIONS**

1. **Orders**.
(a) **Nature of Order; Term**. An Order may take the form of an oral or written request by Purchaser. The term of an Order will continue through completion of all Services or acceptance of all Goods under the Order, the termination date specified in the Order for all Services, or early termination as otherwise provided in the Order or this Agreement, whichever occurs first. For purposes of any Order, any reference in any Attachment to this Agreement to "XTO" shall mean Purchaser, and any reference in any Attachment to "Contractor" or "Seller" shall mean Supplier, unless the Attachment has otherwise been modified in accordance with this Agreement.
(b) **Supplier Agreement**. By executing an Order, acknowledging its receipt, or engaging in any conduct (including, but not limited to, shipping the Goods or performing the Services called for by the Order) which recognizes the existence of a contract pertaining to the Goods or Services shown in the Order, Supplier agrees to the terms and conditions contained in the Order and this Agreement. Any terms contained in any invoice or other acknowledgment of an Order by Supplier or proposed at any time by Supplier in any manner, written or oral, which add to, vary from, or conflict with the terms and conditions in the Order or this Agreement are deemed to be material alterations and are objected to by Purchaser without need of further notice of objection and shall be of no effect nor in any circumstances binding upon Purchaser unless expressly accepted in writing as an amendment to this Agreement or the applicable Order. Written acceptance or rejection by Purchaser of any such terms or conditions shall not constitute an acceptance of any other additional terms or conditions.
(c) **Precedence Regarding Orders**. A written Order shall take precedence over the terms of this Agreement only for purposes of that specific Order, and only to (i) modify the general description of Goods or Services described the Articles; or (ii) add additional Goods or Services. An oral Order shall not take precedence over the terms of this Agreement except to modify the Goods or Services to be provided under that specific Order.
(d) **Definitions.** Definitions provided in the Articles are effective for the General Terms and Conditions and the Attachments. For purposes of this Agreement and any Orders, "Affiliate" means, with respect to a Party, any individual, partnership, joint venture, firm, corporation, association, trust or other entity directly or indirectly controlling, controlled by, or under common control with, such Party. "Party" means Purchaser or Supplier. "Purchaser Group" means individually or in any combination Purchaser, its Affiliates, co-owners or co-lessees (whether of a fee, lease, mineral lease or otherwise) at a Work Site, joint interest owners, joint venturers, partners, contractors and subcontractors other than Supplier or its subcontractors and all of their respective directors, officers, employees, representatives, agents, licensees and invitees. "Supplier Group" means individually or in any combination Supplier, its Affiliates, any subcontractor of Supplier, and their respective directors, officers, employees, representatives, agents, licensees, invitees and assignees. "Work Site" means any location owned, operated or controlled by Purchaser or any of its Affiliates.
(e) **Payment**. Payment for Goods or Services shall be based on the rate and terms in the applicable Order. Subject to Article 10 below and retention rights permitted by law, payment is due within 30days from receipt of a correct invoice and supporting documents. The format of an invoice and the location for submitting an invoice shall be in accordance with in the instructions from Purchaser's applicable accounts payable group.
(f) **Audit Rights.** Supplier will preserve documentation related to an Order for three years after completion of the Order. Documentation includes any records related to Contractor's compliance with this agreement, including but not limited to supporting information for invoiced amounts or services, and any records supporting Safety, Health & Environmental reporting as required under this agreement. Purchaser, or its designated representative, may audit Supplier's compliance with this Agreement and any Order hereunder, at any time during normal business hours, and Supplier will provide Purchaser access to Supplier's documentation, personnel and facilities in support of any such audit and will permit Purchaser to reproduce any of the documentation. Supplier will cause any subcontractors to preserve documentation and allow Purchaser to audit to the same extent. Purchaser will bear its own costs to perform an audit, but will not be liable for Supplier's or subcontractor's costs resulting from an audit. This paragraph shall survive termination of this Agreement for a period of three years.
2. **Independent Contractor**. Supplier, in performing obligations under an Order, shall be an independent contractor solely responsible for controlling and supervising and the safety of its personnel and equipment used in performing the Order. Supplier shall not be the agent of Purchaser for any purpose. Purchaser's interest is in the completed performance of the Order. Neither Supplier, any member of the Supplier Group, nor its or their employees shall be considered employees of Purchaser or any of its Affiliates for any purpose, except in Louisiana and then only if Purchaser should desire to avail itself of a statutory employer defense, nor shall Supplier, any member of the Supplier Group, or its their employees be entitled to participate in or receive benefits from any employee benefit plan sponsored by Exxon Mobil Corporation or any of its Affiliates. Notwithstanding the foregoing, Purchaser retains the right to (a) review a list, in advance of the commencement of any Services to be performed at a Work Site, of Supplier's workers who will be performing Services on such Work Site, and (b) refuse entry to or request that Supplier replace any unsatisfactory worker who is or may be performing Services at a Work Site. Purchaser shall have the right to immediately remove from a Work Site a worker of Supplier whose behavior is unsafe or otherwise unacceptable, rude, harassing or threatening. Purchaser shall not be precluded by this paragraph from asserting any borrowed employee or statutory defense or other available defense.
3. **Subcontractors**. Supplier shall not use any subcontractors to perform Services without written permission from Purchaser, and no such permission will relieve Supplier of any of its obligations under this Agreement and each Order. If use of subcontractors is allowed, Supplier shall ensure that all its contracts with its subcontractors contain provisions which are in conformity with and no less stringent than the provisions of this Agreement and the applicable Order. Supplier shall be responsible to Purchaser for Services performed by all its subcontractors to the same extent it is for activities performed by Supplier's employees.
4. **Quality; Title**.
(a) **Warranties.** Supplier warrants that: (i) it shall provide Goods and Services set forth in an Order free and clear of all liens, taxes, security interests or encumbrances; (ii) it shall perform Services with due diligence and in a safe, workmanlike, and competent manner, using skilled, competent and experienced workers and in accordance with all provisions of this Agreement, the applicable Order, applicable law and good oilfield services or other applicable business or professional practices; (iii) it has or shall obtain, at its expense, before performing any obligations under an Order all the necessary certificates, permits, licenses and authorizations to conduct business and perform the Order; (iv) it shall ascertain, before performing any Services, whether any drawings and specifications are at variance with applicable law and good engineering and operational practices, notify Purchaser of such variances, and with Purchaser's agreement ensure that necessary changes are made; and (v) all Services performed and Goods provided shall meet descriptions or specifications provided or agreed by Purchaser. Supplier further warrants that Goods will be: (w) conveyed with good title, non-infringing, and consistent with any samples, models, or designs provided by Supplier and agreed to by Purchaser (x) fit for their usual, customary, and generally intended purpose; (y) with respect to non-custom Goods, of no less than ordinary quality; and (z) free from defects in material and workmanship for a period of 12 months from acceptance. Supplier

further warrants that Services will be free from defect or deficiency for 12 months from the date of completion or acceptance, whichever occurs last.  If Purchaser discovers any defect or deficiency within the warranty period, and Purchaser has notified Supplier of the defect or deficiency within a reasonable period of time after its discovery, Supplier, at its sole expense, shall at Purchaser's option promptly repair, re-perform, or replace the defective or deficient Goods or Services (including all other labor, materials and other Services necessarily incidental to effecting such correction of the defect or deficiency) or, with respect to Goods, refund any payments made by Purchaser.  The repaired, re-performed, or replaced Goods or Services shall be warranted on the same basis as provided above for the longer of the balance of the above warranty period, or 6 months from the date of completion or acceptance of the repair, re-performance, or replacement. Supplier shall use its best efforts to ensure that any warranties available from subcontractors or manufacturers are assigned or otherwise made available to Purchaser, and shall deliver to Purchaser a copy of each written warranty provided by subcontractors, manufacturers, or any other third parties.  The warranties under this Agreement and the applicable Order shall be in addition to any warranties otherwise provided by law.  Supplier shall promptly notify Purchaser of any change in manufacturing material or technique affecting the quality of Goods.  Substitution of goods and/or extra charges shall not be permitted unless authorized in writing by Purchaser.

(b) **Inspection.**  All Goods delivered and Services performed under this Agreement will be subject to Purchaser's inspection and acceptance. Goods not accepted, delivered in error or in excess of the quantity ordered will be held for Supplier's instruction at Supplier's risk and, if Supplier so instructs, will be returned to Supplier at Supplier's expense.  Purchaser shall have the right at any time to reject, or revoke acceptance of, Goods that fail in any respect to conform to the requirements of this Agreement or the applicable Order.  If Purchaser has already paid for any Goods rejected in accordance with this paragraph, Supplier shall promptly refund to Purchaser the purchase price of such rejected Goods and title to such Goods shall revert to Supplier.  No payment by Purchaser shall limit Purchaser's right to later dispute any of the charges invoiced, and payment shall not be construed as Purchaser's acceptance of any Goods or Services.  No inspection or acceptance will relieve Supplier of any warranties and obligations hereunder.

(c) **Title; Risk of Loss.**  Unless otherwise specified in an Order, title to any Goods provided under this Agreement will pass to Purchaser upon payment therefor by Purchaser or upon delivery to Purchaser's premises or other site designated by Purchaser, whichever occurs earlier.  Unless otherwise specified in an Order or this Agreement, risk of loss or damage to Goods shall pass to Purchaser upon delivery to Purchaser's premises.

5. **Taxes**.  Supplier shall pay all taxes imposed against Supplier or its property or required to enable Supplier to perform the Order.  All taxes, except for applicable state and/or local sales and/or use taxes shall be included in the price of the Services and Goods.  Any applicable state and/or local sales and/or use taxes due on Services or Goods are the duty of Supplier to collect and shall be separately stated on all invoices.  However, Supplier shall not collect or include any sales and/or use taxes on Services or Goods for which Purchaser furnishes a properly completed Exemption Certificate or a direct pay certificate.  Federal excise and state and local taxes or use taxes are not applicable to export Orders.  If requested by Supplier within five years of the date of sale, Purchaser will furnish proof of actual export that will satisfy the exemption requirements for export orders.  Any drawback included in Supplier's price of Goods exported under an Order shall be credited to Purchaser. Supplier shall defend, indemnify and save Purchaser completely harmless against all costs and liabilities that Purchaser may incur with respect to Supplier's failure to make any of the tax payments or take other actions specified in this paragraph.

6. **Suspension and Termination of Services**.  Purchaser may suspend or terminate Services, at any time and for any reason, by notice, written or oral, to Supplier.  If Services are suspended or terminated, Purchaser shall pay Supplier only for Services performed and obligations incurred prior to the suspension or termination and for costs that Supplier directly incurs in suspending or terminating the Services, provided Purchaser has authorized such payments in advance.  Purchaser may, at any time, authorize Supplier to resume any part of suspended Services by notice to Supplier, and Supplier shall then promptly comply.  In no event shall Purchaser be liable for any costs, claims, damages or liabilities whatsoever of Supplier or its subcontractors including, without limitation, consequential, special or indirect damages, loss of anticipated profit or reimbursement, relating to unperformed Services.

7. **Changes to Orders and Cancellation of Orders for Goods.**

(a) **Services.**  Any alteration, deletion or addition to the Services in any provision(s) of an Order shall be effective only if made in an oral or written change order or other written instrument signed by Purchaser and Supplier ("Change Order").  A Change Order, however, shall not modify any provisions of this Agreement or an Order except to the extent that an Order is permitted to do so in Section 1.C. above.

(b) **Goods.**  At any time after issuing an Order until the Goods are shipped, Purchaser may change or cancel the Order with respect to Goods. Supplier will charge Purchaser only the net prices and costs in the Order for the actual Goods shipped and kept by Purchaser under any changed Order.  Supplier will not charge Purchaser for any Order or part thereof cancelled pursuant to this subsection except for cancellation charges, if any, set out in the applicable Order.  Supplier shall charge Purchaser only the costs allowed in this Section 7 for cancellation, except that Purchaser will be responsible for all costs to transport Goods that must be returned to Supplier under the terms of a change or cancellation.

8. **Purchaser's Premises**.  Prior to commencing Services on a Work Site, Supplier will inspect the Work Site and ascertain whether any health or safety hazards exist which would require the use of personal protective equipment or specific operating practices in order to provide Supplier's employees, subcontractors, and agents with a safe place to work, and Supplier will ensure that its employees, subcontractors, and agents are aware of any known hazards and that they have and utilize the necessary practices and protective equipment.

9. **Debris and Trash**.  For any Services performed at Purchaser's Work Site, Supplier shall accumulate on-site all debris and trash material resulting from Supplier's operations and keep and leave the Work Site in a condition satisfactory to Purchaser.  Supplier shall properly dispose of its trash off the Work Site unless other acceptable arrangements with Purchaser have been made.

10. **Liens**.  Supplier shall ensure that no liens of any kind are fixed upon or against the real or personal property of Purchaser or its lessors by Supplier, Supplier's employees, subcontractors, or subcontractor's employees.  Supplier shall indemnify, defend, protect and hold Purchaser harmless from all such claims and liens. If requested, Supplier shall furnish Purchaser with full releases (on forms satisfactory to Purchaser) of all claims and liens for labor and materials used in the performance of an Order. Purchaser may withhold payment of amounts due to Supplier under this Agreement (including the applicable Order and any other Orders) and any other contract between Purchaser and Supplier until Purchaser has been furnished with proof that all amounts have been paid.  If a lien arising from an Order attaches to a Work Site, Purchaser may, at its sole option, make any payment necessary to discharge the lien, and it may offset the amount of the lien, together with damages and costs, including court costs and reasonable attorneys' fees, that it incurs because of the lien or its discharge against any payment owing or to be owed to Supplier.

> **11. Release, Defense, Indemnity and Hold Harmless**
> (a) **Supplier's Obligations**. Supplier agrees to release, defend, indemnify and hold the Purchaser Group harmless from and against any and all claims, demands, and causes of action of every kind and character (including without limitation, fines, penalties, remedial obligations, court costs and reasonable attorneys' fees, including attorneys' fees incurred in the enforcement of this indemnity) (collectively the "Indemnifiable Claims") arising out of, without limitation, any physical or mental injury, illness and/or death of any one or more members of the Supplier Group in any manner incident to, connected with or arising out of the performance of this Agreement or an Order. This obligation is without regard to the cause or causes of such physical or mental injury, illness, death, and includes, but is not limited to, Indemnifiable Claims resulting from any sole, gross, joint or concurrent negligence, willful misconduct, strict liability, or other act and/or omission of any one or more members of the Purchaser Group. Supplier agrees that its indemnity obligations herein will be supported by insurance with at least the minimum amounts provided in Section 12, which insurance will be primary to any other insurance provided by or available to any one or more members of the Purchaser Group and shall provide waivers of subrogation against all members of the Purchaser Group. To the extent that applicable law prohibits the monetary limits of insurance required or the indemnities voluntarily assumed hereunder, the requirements will automatically be revised to conform, to the maximum extent permitted, with applicable law.
> (b) **Purchaser's Obligations**. Purchaser agrees to release, defend, indemnify and hold the Supplier Group harmless from and against any and all Indemnifiable Claims arising out of, without limitation, any physical or mental injury, illness and/or death of any one or more members of the Purchaser Group in any manner incident to, connected with or arising out of the performance of this Agreement or an Order. This obligation is without regard to the cause or causes of such physical or mental injury, illness, death, and includes, but is not limited to, Indemnifiable Claims resulting from any sole, gross, joint or concurrent negligence, willful misconduct, strict liability, or other act and/or omission of any one or more members of the Supplier Group. Purchaser agrees that its indemnity obligations herein will be supported by insurance or self-insurance with at least the minimum amounts provided in Section 12, which insurance will be primary to any other insurance provided by or available to any one or more members of the Supplier Group and shall provide waivers of subrogation against all members of the Supplier Group. To the extent that applicable law prohibits the monetary limits of insurance required or the indemnities voluntarily assumed hereunder, the requirements will automatically be revised to conform, to the maximum extent permitted, with applicable law.
> (c) **Certain States.** To the extent this Section 11 is governed by Louisiana, New Mexico or Wyoming law, the provisions therein shall be read not to include indemnification for one's own negligence.

12. **Insurance**.
(a) **Coverages.** Supplier will secure and maintain, and will require its subcontractors to secure and maintain, during the term of this Agreement, the following insurance with limits not less than the amounts specified, and will furnish certificates of such insurance satisfactory to Purchaser before performing an Order; provided, however, that no waiver of the provisions of this Section 12 will occur to any extent merely from a failure on the part of Purchaser to object or complain about Supplier's failure to furnish certificates of insurance: (1) Worker's Compensation and Employer's Liability Insurance with limits of not less than $500,000 per accident, which will fully comply with the statutory requirements of state and federal laws as applicable; (2) Commercial General Liability Insurance INCLUDING CONTRACTUAL LIABILITY, with minimum limits of liability for injury, death, or property damage of $1,000,000 combined single limit per occurrence and an aggregate annual limit of not less than $2,000,000; and (3) Automobile Liability Insurance covering owned, hired, and non-owned vehicles used by Contractor, with minimum limits of liability for injury, death, or property damage of $1,000,000 combined single limit per occurrence.
(b) **Primary Coverage and Additional Insureds**. All insurance policies and coverages listed in this Section 12 will extend to and protect the Purchaser Group to the full extent and amount of such coverage, including excess or umbrella insurances. All insurance policies and coverages listed in this Section 12 will be primary to, and receive no contribution from, any other insurance or self-insurance programs maintained by or on behalf of or benefiting the Purchaser Group. The limits and coverages of the insurances obtained by Supplier will in no way limit the liabilities or obligations assumed by Supplier under this Agreement or an Order. All of Supplier's liability insurance policies will name the Purchaser Group as an additional insured. All of Supplier's liability insurance policies will contain a waiver on the part of the insurer, by subrogation or otherwise, of all rights against the Purchaser Group.
(c) **Certificates**. Supplier's insurance carrier(s) will provide, as evidence that the required insurance coverage has been obtained and maintained, a certificate of insurance reflecting the insurance requirements of this Section 12, which certificate shall be on a form approved by the Texas Department of Insurance. No waiver of the provisions of this Section 12 will be inferred from any failure on the part of Purchaser to object or complain about any failure of Supplier's insurance carrier to provide such certificate of insurance. Supplier shall provide Purchaser notice and evidence of any modification to, or extension or cancellation of, Supplier's required insurance coverage.
13. **Use of Purchaser's Names and Marks**. Supplier shall not use Purchaser's or any of its Affiliate's name, trade name, or trademarks in any advertising or communication to the public, or make publicity releases or announcements concerning this Agreement or any Order or related activities, in any format, without Purchaser's prior express written consent.
14. **Confidential Information**. Supplier shall hold in confidence all technical and business information disclosed to or made available to Supplier by Purchaser or its Affiliates or developed or acquired by Supplier in performance of this Agreement or an Order. Supplier shall not, without Purchaser's prior written approval, use such information for any purpose other than performance of the applicable Order. Purchaser accepts no obligation of confidence with respect to items acquired or information disclosed, no matter how labeled, to Purchaser by Supplier unless specifically provided for in a separate, written confidentiality agreement. Supplier shall not take any photographs, videos, or other recordings of Purchaser's or Affiliates' property without Purchaser's prior written consent. This Section 14 shall survive termination of this Agreement.
15. **Ownership of Documents, Drawings and Specifications**. All drawings, field notes, specifications, computer programs (data files and other software in whatever form), and any other documents, records, and materials, whether written, audio, or video, specifically developed by Supplier for Purchaser in connection with an Order ("Documents") shall be provided to Purchaser upon Purchaser's request. If so requested, Supplier shall provide the original and all copies of the Documents to Purchaser when performance under an Order is completed or earlier upon Purchaser's written request. If so requested, Supplier hereby assigns, agrees to assign in the future as necessary, in the sole opinion of Purchaser, and shall require its employees and subcontractors to assign, the copyrights for all such Documents to Purchaser.
16. **Ownership of Inventions.** If Supplier or its personnel make any inventions, patentable or unpatentable, resulting from Supplier's activities hereunder, Supplier shall promptly disclose those inventions to Purchaser in writing. Further, Supplier hereby assigns each invention to Purchaser or Purchaser's designee. Supplier also shall require its personnel to review and execute such papers as Purchaser or Purchaser's designee requests in connection with any assignment and in connection with the acquisition of letters patent, U.S. and foreign, on any inventions.

17. **Other Intellectual Property Matters**. For purposes of this Section 17, "Intellectual Property Right" means any patent, trademark, copyright, trade secret, or other proprietary right of a third party. Supplier warrants and represents that the Services, Goods, materials and articles, in the form delivered to Purchaser, including any labels or trademarks affixed thereto by or on behalf of Supplier, are free from any claim of a third party for infringement or misappropriation of an Intellectual Property Right. Supplier shall defend at Supplier's expense and indemnify and hold Purchaser harmless against any and all expenses, liability or loss from any claim or lawsuit for alleged infringement or misappropriation of any Intellectual Property Right resulting from the manufacture, sale, use, possession or other disposition of any Services, Goods, materials, or articles furnished by Supplier under the Order. The indemnities set forth in this paragraph shall include, without limitation, payment as incurred and when due of all penalties, awards, and judgments; all court and arbitration costs; attorney's fees and other reasonable out-of-pocket costs incurred in connection with such claims or lawsuits. Purchaser may, at its option, be represented by counsel of its own selection, at its own expense. Supplier shall not consent to an injunction against any of Purchaser's operations, the payment of money damages, the granting of a license or the parting of anything of value by Purchaser with respect to resolution or settlement of any claim or lawsuit.

18. **Set Off**. Purchaser may set off any loss, damage, liability or claim that Purchaser may have against Supplier against any performance or payment due to Supplier under any Order or any other contract between the Parties.

19. **Compliance with Purchaser Policies and Applicable Laws**. In connection with any Services performed at a Work Site, Supplier will comply with and will cause the Supplier Group to comply with all of Purchaser's applicable rules and regulations (as revised from time to time) that relate to the safety and security of persons and property, protection of the environment, housekeeping and plant work hours, including, but not limited to, the Drug, Alcohol, Firearms, Vehicle Search and Contraband Policy of XTO Energy Inc. ("XTO") attached hereto as Attachment 1 and XTO's Safety, Health and Environmental Policy attached hereto as Attachment 2. Depending upon the scope and nature of the Services to be performed, Purchaser may require Supplier or the Supplier Group to execute other XTO safety policies or to complete policy questionnaires or surveys. XTO or Purchaser may revise, amend or alter its rules or policies or adopt new or additional rules or policies and they will become a part of this Agreement when Supplier receives a copy of them. Supplier will comply, and will cause the Supplier Group to comply, with all federal, state and local laws, rules, regulations, ordinances, executive orders and other applicable requirements of all governmental agencies having jurisdiction over the Goods and Services which now or in the future may be (i) applicable to Supplier's performance hereunder or (ii) applicable to Supplier's or the Supplier Group's business, equipment or employees engaged in or in any manner connected with its performance hereunder. All of the provisions of this Agreement shall be expressly subject to all applicable laws, orders, rules and regulations of any governmental body or agency having jurisdiction, and all Services contemplated hereunder shall be conducted in conformity therewith. Any provision of this Agreement which is inconsistent with any such laws, orders, rules or regulations shall be modified so as to conform therewith, and this Agreement, as so modified, shall continue in full force and effect. Purchaser and Supplier shall execute such documents as may be reasonably required to conform with any applicable law or order. To the extent that Attachment 3, Equal Employment Opportunity Provision, Certification of Non-Segregated Facilities, and Employment of Qualified Disabled Individuals and Veterans, applies to this Agreement, Supplier will abide by Attachment 3, and will ensure that the Supplier Group abides by Attachment 3 to the extent applicable.

20. **Business Standards**. Supplier shall establish and maintain precautions to prevent its employees, agents or representatives from making, receiving, providing, or offering substantial gifts, entertainment, payments, loans, or other consideration to employees, agents, or representatives of Purchaser for the purpose of influencing those persons to act contrary to the best interests of Purchaser. This obligation shall apply to the activities of the employees of Supplier in their relations with the employees of Purchaser and their families and/or third parties arising from an Order. Supplier agrees that all financial settlements, billings, and reports rendered to Purchaser or its representative may be relied upon as being complete and accurate in any further recordings and reports made by Purchaser or its representatives for whatever purpose. Supplier shall comply and secure compliance by its subcontractors with all law applicable to the performance of any Order. Supplier agrees to notify Purchaser promptly upon discovery of, and work with Purchaser to rectify, any instance where Supplier fails to comply with the provisions of this Section 20.

21. **Force Majeure**. For the purposes of each Order, "Force Majeure" means any event beyond the control and without fault or negligence of the Party claiming inability to perform its obligations and which Party is unable to prevent or provide against by the exercise of reasonable diligence, including but not limited to: acts of God or public enemy; expropriation or condemnation of facilities; changes in applicable law; war, civil disturbance, floods, unusually severe weather that could not reasonably have been anticipated; fires, explosions or other catastrophes; and strikes. Inability to pay moneys or financial hardship shall not, however, constitute events of Force Majeure. No delay or failure in performance by Purchaser or Supplier shall constitute default under the Order if, and to the extent, the delay or failure is caused by Force Majeure. Unless the Force Majeure substantially frustrates performance of the Order, Force Majeure shall not operate to excuse, but only to delay, performance. If performance is delayed by reason of Force Majeure, Supplier shall promptly notify Purchaser. Supplier shall do all things reasonably possible to mitigate and remove the Force Majeure event, except a strike, and shall resume performance under the Order as soon as possible. In no event shall Purchaser be liable to Supplier and Supplier shall hold Purchaser harmless for Supplier's, subcontractor's, and their employees' damages, anticipated profits, or other sums or payments occasioned by the event. If a condition of Force Majeure remains in effect for more than ninety (90) days, Purchaser shall have the right to terminate the applicable Order.

22. **Assignment**. Supplier shall not assign this Agreement or an Order in whole or in part (including any sum accruing to Supplier) without Purchaser's prior written approval. No assignment, even if approved by Purchaser, will relieve Supplier of its responsibilities under this Agreement or an Order.

23. **Storage and Bailment of Purchaser's Materials and/or Equipment**. If Supplier or any subcontractor stores any of Purchaser's materials and/or equipment under one or more Orders, Supplier shall keep and provide those records that may be requested by Purchaser including, but not limited to, an inventory of such materials and/or equipment, by location, at the end of each calendar year, or more frequently if requested by Purchaser. Supplier shall charge Purchaser a fee for storing the materials and/or equipment only if that fee is agreed to by Purchaser in writing and included in a price schedule or similar document. Supplier shall: (i) store such materials and/or equipment in a clean, dry, and secure location, unless otherwise agreed in writing by Purchaser, (ii) segregate such materials and/or equipment from items belonging to entities other than Purchaser, if the materials are of a nature which may be segregated, and (iii) mark, or otherwise indicate in a manner to make it evident to Supplier's creditors, that such materials and/or equipment belong to Purchaser. Purchaser shall have access to such materials and/or equipment during Supplier's normal business hours, and Supplier shall use reasonable commercial efforts to provide Purchaser access to such materials, when requested by Purchaser, during non-business hours. Supplier and Purchaser agree that delivery of Purchaser's materials and/or equipment is considered by both parties to be a bailment and not subject to the terms and conditions of the Uniform Commercial Code or similar law, as the same may be codified in applicable state law pertaining to sales and/or secured transactions. If materials and/or equipment stored by Supplier under one or more Orders are lost, stolen or damaged, Supplier shall be responsible for the full replacement value of such materials and/or equipment.

24. **Material Safety Data Sheets**. If applicable, in accordance with the Occupational Safety and Health Administration's Hazard Communication Standard, 29 CFR 1910.1200, Supplier shall provide to Purchaser all Material Safety Data Sheets (MSDS) applicable to the Goods purchased at or before the time of the initial shipment. All updates to such MSDS shall be provided to Purchaser with the first shipment after updating.

25. **Usage Reports**. At Purchaser's request, Supplier shall provide usage reports to Purchaser setting out descriptions and quantities of Goods and Services provided to Purchaser, locations where Services are performed or Goods are shipped, dollars expended, and such other reasonable usage documents as Purchaser may request from time to time.

26. **Software.** If Goods are provided with embedded or included software or firmware that is not covered by Section 15, whether created by Supplier or a third party, Supplier grants to Purchaser a perpetual, royalty-free, worldwide and irrevocable right to use the software in connection with use of the Goods, which right is extendable to any person or entity permitted by Purchaser to use the Goods and which is fully transferable in connection with any sale or other transfer of the Goods. If access to or use of the software or firmware requires Purchaser to "accept" terms and conditions through use of "click-wrap", "shrink-wrap" or any other means, Purchaser may "accept" in order to access or use the software or firmware, however such terms and conditions will be of no force or effect and Purchaser's use rights shall be governed solely by this Agreement. Embedded or included software or firmware shall be treated as "Goods" for all purposes.

27. **Consequential Damages**. In no event will either Party be liable to the other under this Agreement for indirect, special, incidental, punitive or consequential damages, including, but not limited to, loss of profits, loss of use of assets or loss of product or facilities downtime. This Section 27, however, shall in no way limit or modify a Party's indemnity obligations under Section 11 above.

28. **Miscellaneous**. If any provision or portion of this Agreement or an Order shall be adjudged invalid or unenforceable by a court of competent jurisdiction or by operation of any applicable law, that provision or portion of the Agreement or Order shall be deemed omitted and the remaining provisions and portions shall remain in full force and effect. The provisions of this Agreement or an Order that by their nature continue, including, but not limited to, the warranty, confidentiality, indemnification, and allocation of liability provisions, shall survive any expiration, cancellation or termination thereof. No waiver by a party of a right or default shall be effective unless in writing. No such waiver shall be deemed a waiver of any subsequent right or default of a similar nature or otherwise. The headings in this Agreement are for ease of reference only and shall not be used to construe or interpret its provisions. Time is of the essence of this Agreement.

<u>*Attachment 1*</u>

## XTO Energy Inc.
## Contractor Attachment for Alcohol and Drug Requirements
### (For Exclusively Low Exposure Services)

1. **Purpose and General Requirements**

    a. Contractor shall comply, and shall ensure that its subcontractors performing Covered Services as defined below, are complying with this Attachment.

    b. All testing requirements identified in this Attachment must comply with the U.S. Department of Transportation ("DOT") specimen, collection, security, and testing procedure, unless otherwise agreed. Additionally, blood tests may be used for confirmation test of positive results. The panel for substances and levels to be tested is described in Supplement 1.

    c. Local laws and regulations take precedence over this Attachment. Local laws and regulations may require a more stringent or less stringent approach and may limit certain components of this Attachment.

2. **Definitions**

    a. *Buyer* – May be used interchangeably with XTO, Purchaser, User, or Company (but only when Company is the purchasing entity).

    b. *Buyer Premises* – locations and property, owned (or leased or chartered from others or accessed through rights secured by the Buyer or its affiliates), operated, and/or controlled by the Buyer or its affiliates, whether fixed or mobile.

    c. *Contraband* -

        i. any drug or alcohol-related paraphernalia, or

        ii. any substance used or designed for use to obstruct the Alcohol or Drug testing process, or

        iii. firearms, ammunition, explosives, and weapons.

    d. *Contractor Personnel* - Contractor's employees, agents, subcontractors or subcontractors' employees who perform Covered Services or whom Contractor, its agent, or subcontractor, plans to return to Covered Services.

    e. *Covered Services* – Performance of services on Buyer Premises.

    f. *Prescription Drug* - A regulated pharmaceutical medicine that requires physician or other qualified healthcare professional authorization before it can be obtained in the jurisdiction where Contractor Personnel are performing Covered Services.

    g. *Prohibited Substances* –

        i. Marijuana in any form, even if legal in the local jurisdiction.

        ii. Potentially impairing medications (e.g. may be Prescription Drug or over-the-counter medication or herbal medicine):

            1) Used without a prescription, or

            2) Used in a manner inconsistent with the prescription or directions for usage, or

        iii. Alcohol, which means any consumable liquid containing ethanol (e.g. beer, wine, spirits) and powdered Alcohol that can be reconstituted into an Alcoholic drink

        iv. Illicit drugs that are not or cannot be prescribed, or mind-altering substances including all forms of naturally occurring and synthetic drugs e.g., synthetic cannabinoids, stimulants and hallucinogens that would inhibit the ability of Contractor Personnel to perform work safely.

    h. *Stand Down* - Requires immediate removal of Contractor Personnel from Covered Services.

i. *Under the Influence* – is a condition in which the mental or physical faculties are impaired by the use of Prohibited Substances that can be observed through appearance, behavior, speech, body odor, etc. or through a confirmed positive alcohol or drug test.

3. **Prohibitions**

   Contractor Personnel are disqualified from Covered Services if they fail to comply with the Prohibitions below.

   a. Unless specifically authorized in writing by Buyer, while on Buyer Premises (including off-duty time), Contractor Personnel are prohibited from:
      i. Using, possessing, selling, manufacturing, distributing, concealing, or transporting any Prohibited Substance or Contraband.
      ii. Being Under the Influence of any Prohibited Substance.
      iii. Having a confirmed positive for alcohol or a MRO Positive for drugs.
   b. Contractor Personnel are prohibited from switching or adulterating any urine, blood, or any other specimen, participating in any attempt to adulterate or substitute a specimen, obstructing the collection or testing process, failing to promptly proceed to a collection site and provide specimens when told to do so, refusing to test, refusing to sign required forms, and failing to cooperate with or refusing to submit to an inspection.
   c. Contractor Personnel are prohibited from operating a vehicle on behalf of the Buyer while Under the Influence.

4. **Inspection**

   a. At any time on Buyer Premises, Buyer may conduct or require Contractor to conduct an unannounced inspection of Contractor Personnel and their property for items including Prohibited Substances or Contraband. Inspections may include, but are not limited to: clothing, wallets, purses, baggage, lockers, work areas, desks, tool boxes, and vehicles.
   b. Buyer or Contractor may authorize inspection specialists, including scent-trained animals to conduct an inspection.
   c. If discovery of Prohibited Substances or Contraband cannot be directly associated with individual Contractor Personnel, but can be reasonably associated with a defined group of Contractor Personnel (e.g., people who use one change room):
      i. Buyer may conduct or require Contractor to conduct an inspection as described above of Contractor Personnel group's clothing, wallets, purses, baggage, lockers, work areas, desks, tool boxes, vehicles and any other designations by Buyer; and/or
      ii. Buyer may require Contractor to conduct Group Suspicion-based Testing of Contractor Personnel within this group.

5. **Requirements for Disqualified Contractor Personnel**

   When Contractor Personnel are disqualified from Covered Services:

   a. Contractor shall immediately notify Buyer that Contractor Personnel are disqualified from Covered Services. Contractor need not disclose to Buyer that disqualification is the result of a Positive alcohol or drug test.
   b. Contractor must not assign or reassign disqualified Contractor Personnel to Covered Services at any Buyer Premises.
   c. Contractor shall immediately or as soon as practicable remove from Buyer Premises Contractor Personnel that are disqualified.
   d. At Buyer's request Contractor shall verify the quality of all Covered Services in which disqualified Contractor Personnel may have participated, and submit a written report to Buyer that documents the verification, any findings, and the actions taken to assure all deficiencies have been corrected.

6. **Testing Requirements**
   a. **Test Types**
      i. **Individual Reasonable Suspicion Testing** – Individual Reasonable Suspicion testing is conducted when there is suspicion of specific Contractor Personnel being Under the Influence.
      ii. **Post Incident Testing** - If the performance of Contractor Personnel contributed or may have contributed to an incident, they must be alcohol and drug tested. For purposes of this part, "incident" includes, but is not limited to, an actual event that caused, or had potential to cause, significant safety, environmental, or property damage incidents such as:

1) Medical treatment beyond first aid, or
2) Reportable environmental release, or
3) Disabling damage to a vehicle, or
4) Significant property damage.

Buyer may define more stringent criteria.

iii. **Group Suspicion-based Testing** – Group Suspicion-based testing may be required without notice on Buyer Premises, based on evidence of Prohibited Substances or Contraband that cannot be identified to a specific individual. Group Suspicion-based testing must be limited to the likely affected work group or work area.

b. **Testing Process**

When a decision is taken to conduct an alcohol and drug test, Contractor shall immediately Stand Down the Contractor Personnel.

Alcohol and drug testing must be completed within 2 hours after the decision to test. If specimen collection is not completed within 2 hours, document the reason for delay. Buyer may request to review reasons for test delays and decide if they are acceptable.

The required substances to be tested and the confirmation cut off levels must comply, at a minimum, with the Alcohol and Drug Test Panel listed in Supplement 1. An alcohol test is to be done any time a drug test is done.

7. **Return to Covered Services**
   a. Alcohol Testing
      i. Following alcohol testing for any test type, Contractor Personnel shall immediately Stand Down if an alcohol screening test result is at or over the screening cutoff level.
      ii. If a confirmation test is negative Contractor Personnel must not return to Covered Services until 8 hours have elapsed.

   Note: Buyer may define more stringent criteria.

   b. Individual Reasonable Suspicion and Post Incident Drug Testing - Buyer in its sole discretion will consider Contractor request for Contractor Personnel to return to Covered Services only after negative alcohol and negative drug test results have been documented in writing to Buyer.
   c. Group Suspicion based Testing – Buyer in its sole discretion may consider Contractor Personnel to return to Low Exposure Covered Services while awaiting alcohol and drug test results. Buyer in its sole discretion will consider Contractor request for Contractor Personnel to return to Safety Sensitive Covered Services only after negative alcohol and negative drug test results have been confirmed by Contractor Management and communicated to Buyer.
   d. Fitness for Work - After a fitness for work concern is identified, and before Contractor can return Contractor Personnel to Covered Services, Contractor's health professional must evaluate Contractor Personnel and clear them to return to work with or without restrictions as applicable. Note: Buyer may define more stringent criteria in writing.

8. **Monitoring and Review**

   a. Buyer shall have the right, at its discretion, to perform periodic assessments of Contractor's compliance with this Attachment. This assessment includes Contractor Personnel and all tiers of subcontractor personnel performing Covered Services.

   b. Contractor shall retain documents that support compliance with this Attachment for current calendar year plus the previous three calendar years and have them readily available for review by Buyer.

## Supplement 1

### Alcohol and Drug Test Panel and Cutoffs

For Agreements spanning multiple years, Buyer reserves the right to update this Alcohol and Drug Test Panel and Cutoffs, and Contractor should confirm at least annually that it is complying with the latest Buyer panel.

|  | SCREENING CUT-OFF (g/dL) | CONFIRMATION CUT-OFF (g/dL) | Comments |
|---|---|---|---|
| **ALCOHOL** | 0.02 | 0 04 | Blood-alcohol content (BAC) or its equivalent |
| **DRUG CLASS ANALYTES** | SCREENING CUT-OFF (ng/mL) | CONFIRMATION CUT-OFF (ng/mL) | Comments |
| **AMPHETAMINES** | 500 | | |
| AMPHETAMINE | | 250 | |
| METHAMPHETAMINE | | 250 | |
| MDMA | | 250 | |
| MDA | | 250 | |
| MDEA | | 250 | |
| **BARBITURATES** | 300 | | |
| AMOBARBITAL | | 200 | |
| BUTALBITAL | | 200 | |
| PENTOBARBITAL | | 200 | |
| PHENOBARBITAL | | 200 | |
| SECOBARBITAL | | 200 | |
| **BENZODIAZEPINES** | 300 | | |
| ALPRAZOLAM METABOLITES | | 100 | Required for all regions |
| NORDIAZEPAM | | 100 | Required for all regions |
| OXAZEPAM | | 100 | Required for all regions |
| TEMAZEPAM | | 100 | Required for all regions |
| FLURAZEPAM METABOLITES | | 100 | Required for North America, Outside North America test if recommended by testing laboratory in the region/country |
| LORAZEPAM | | 100 | Required for North America, Outside North America test if recommended by testing laboratory in the region/country |
| TRIAZOLAM METABOLITES | | 100 | Required for North America, Outside North America test if recommended by testing laboratory in the region/country |
| **COCAINE METABOLITES** | 150 | | |
| BENZOYLECGONINE | | 100 | |
| **MARIJUANA METABOLITES** | 20 | | |
| THCA (11-nor delta-9 THCA) | | 10 | |
| **METHADONE** | 300 | 200 | |
| **OPIATES** | 300 | | |
| MORPHINE | | 100 | |
| CODEINE | | 100 | |
| HYDROMORPHONE | | 100 | |
| HYDROCODONE | | 100 | |
| 6-ACETYLMORPHINE (6-AM) | 10 | 10 | For laboratory based testing only use screening cut-off for 6-AM. For FSD testing only test for 6-AM when Morphine confirmed at 100 |
| **OXYCODONES** | 100 | | |
| OXYMORPHONE | | 100 | |
| OXYCODONE | | 100 | |

**Synthetic Cannabinoids – U.S. Only**

| Parent Compound | Required Urine Testing Metabolite | Maximum Screening and Confirmation Cutoff Levels (ng/mL) | |
|---|---|---|---|
| JWH-018/AM-2201 | JWH-018 N-pentanoic acid | 2.0 to May 31, 2016 | 0.2 screening and confirmation June 1, 2016 and beyond |
| JWH-073 | JWH-073 N-butanoic acid | 2.0 to May 31, 2016 | 0.2 screening and confirmation June 1, 2016 and beyond |
| UR-144/XLR-11 | UR-144 N-pentanoic acid | 4.0 to May 31, 2016 | 0.5 screening and confirmation June 1, 2016 and beyond |
| AKB-48 - (APINACA) | AKB48 N-pentanoic acid | 2.5 | |
| BB-22 | BB-22-3-carboxyindole | 5 | |
| PB-22 - (CUPIC) | PB-22-3-carboxyindole | 5 | |
| 5-Fluoro-PB-22 - (5F-PB-22) | 5-Fluoro PB-22-3-carboxyindole | 5 | |
| AB-FUBINACA | AB – FUBINACA oxobutanoic acid | 2.5 | |
| ADB-PINACA | ADB- PINACA N-pentanoic acid | 5 | |
| AB CHMINACA | AB CHMINACA 3-methyl-butanoic acid ("M2") | 2.5 | |
| AB PINACA/5-F-AB-PINACA | AB PINACA N-pentanoic acid | 5 | |
| ADBICA | ADBICA N-pentanoic acid | 5 | |

*Attachment 2*

## XTO ENERGY INC. SAFETY, HEALTH AND ENVIRONMENTAL POLICY

XTO is committed to protecting the environment and the health and safety of employees, contractors, local communities, and others who may be impacted by its business activities. XTO requires its contractors to actively participate, and to cause its affiliates, subcontractors, and other members of the Contractor Group to actively participate, in the establishment of a safe working environment as follows:

**CONTRACTOR AND THE CONTRACTOR GROUP'S RESPONSIBILITIES**

- Perform all work in a safe, environmentally sensitive, and workmanlike manner and provide necessary safety precautions and equipment for their employees, contractors, consultants, and other personnel.

- Report all incidents occurring on XTO property immediately to your XTO representative.

- Within 48 hours a written report is required for incidents meeting the following criteria

   a. OSHA Recordable or incidents requiring evaluation or treatment by medical professional
   b. Any spills >1 bbl or spills requiring notification to an agency or spill volume not immediately known
   c. Any gas release
   d. Any fire/explosion
   e. Damage to XTO property or any equipment impacting operations
   f. Any significant near misses

- Instruct its employees in the applicable XTO standards and practices.

- Conduct its operations in a manner that protects human health and safety, minimize adverse environmental impacts, and mitigates unavoidable impacts on the environment.

- Comply with all applicable safety, health, and environmental laws and regulations, and apply responsible standards where law or regulations do not exist.

- Have in place an active injury and loss prevention program and advise and train line managers in safety, health, and environmental requirements.

- Provide its employees with adequate training in safety, health, and environmental matters, and hold each employee accountable for compliance with this policy.

- Provide technical and legal support to those line managers responsible for compliance with this policy.

- Require timely communication between employees and their supervisors regarding safety, health, and environmental issues.

- Require employees to communicate their concerns to management about any unresolved safety, health, and environmental risks they might have identified in the Contractor's operations.

- Monitor, evaluate and report performance in safety, health, and environmental protection.

- Provide a copy of this policy to the Contractor's contractors and notify them that they and their subcontractors will be expected to perform all work for the Contractor in compliance with this policy.

- Emphasize the importance of maintaining safety and environmental standards in economically-competitive situations.

## CONTRACTOR AND THE CONTRACTOR GROUP'S PERSONNEL (EMPLOYEE/ SUBCONTRACTOR / CONTRACTOR / CONSULTANT) RESPONSIBILITIES:

Each employee shall demonstrate a positive attitude toward injury-prevention and environmental protection and company property. Each employee is responsible for:

- Performing their job safely, for their personal safety, the safety of fellow workers, and the protection of the environment and company property. This includes the proper use of safety equipment and strict adherence to safe work practices.

- Understanding all safety and environmental policies pertinent to their job responsibilities.

- Performing safety and environmental assessments.

- Actively participating in safety and environmental meetings.

- Reporting promptly all unsafe conditions and practices (including those of contractors), to their supervisor.

- Reporting every spill/release to their supervisor.

*Attachment 3*

# EQUAL EMPLOYMENT OPPORTUNITY PROVISION, CERTIFICATION OF NONSEGREGATED FACILITIES, AND EMPLOYMENT OF QUALIFIED DISABLED INDIVIDUALS AND VETERANS

The term "Contractor" as used herein shall mean the party designated as Contractor, of which this Attachment is a part. The term "Agreement," as used herein shall mean the foregoing agreement to which this Attachment is a part. This Agreement, and all activities or operations conducted by the Parties under this Agreement, are expressly subject to, and shall comply with, all laws, orders, rules, and regulations of all federal, state, and local governmental authorities having jurisdiction over the Work, including but not limited to Executive Order 11246.

1. **EQUAL EMPLOYMENT OPPORTUNITY PROVISION**.

If the value of this Agreement exceeds $10,000, then during the performance of this Agreement, Contractor agrees as follows:

    A.    The contract clause prescribed in Section 202 of Executive Order No. 11246 of September 24, 1965 (40 CFR 60-1.4), is incorporated by reference into this Attachment.

    B.    Contractor further agrees and certifies that, if the value of this Agreement is $50,000 or more and Contractor has 50 or more employees, and is not otherwise exempt, Contractor will:

(1) Develop and maintain a written affirmative action compliance program for each of his establishments in accordance with the requirements of 41 CFR 60-1.40 and 60-2. This program shall be developed within 120 days of the commencement of a covered contract, and shall be updated annually and maintained as long as required by law or regulation.

(2) File annually, complete and accurate reports on Standard Form 100, Equal Employment Opportunity information Report EEO-1, in accordance with the requirements of 41 CFR 60-1.7, and otherwise comply with and file such other compliance reports as may be required under Executive Order 11246, as amended, and Rules and Regulations adopted thereunder.

2. **CERTIFICATION OF NONSEGREGATED FACILITIES**.

Contractor certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not permit its employees to perform their services at any location under its control where segregated facilities are maintained. Contractor certifies further that it will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. Contractor agrees that a breach of this certification is a violation of the Equal Opportunity clause in this Agreement. The term "segregated facilities" means any waiting room, work areas, restrooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, sex, sexual orientation, gender identity, or national origin, because of habit, local custom or otherwise, provided that separate or single-user restrooms and necessary dressing or sleeping areas shall be provided to assure privacy between the sexes. Contractor further agrees that (except where it has obtained identical certifications from proposed subcontractors for the specific time period) it will obtain identical certification from proposed subcontractors prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity clause; that it will retain such certifications in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for the specific time period).

"NOTICE TO PROSPECTIVE VENDORS AND SUBCONTRACTORS

REQUIREMENT FOR CERTIFICATION OF NONSEGREGATED FACILITIES

**A Certification of Non-segregated Facilities, to ensure satisfaction of the requirements of 41 CFR 60-1.8, must be submitted prior to the award of any contract or subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause (41 CFR 60-1.4). The Certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semi-annually or annually). (NOTE: The penalty for making false statements is prescribed in 18 U.S.C. 1001)."**

3. **EMPLOYMENT OF QUALIFIED DISABLED INDIVIDUALS AND VETERANS**.

Contractor will not discriminate against any employee or applicant for employment because of physical or mental disability in regard to any position for which the employee or applicant for employment is qualified. To comply with 41 CFR 60-741 (Section 503 of the Rehabilitation Act of 1973, as amended), any Contractor with a contract over $10,000 in value must establish an affirmative action program to employ and advance in employment qualified disabled individuals. Contractor will not discriminate against any employee or applicant for employment because he or she is a special disabled veteran, veteran of the Vietnam era, recently separated veteran, or other protected veteran in regard to any position for which the employee or applicant for employment is qualified. To comply with 41 CFR 60-300 (Section 402 of the Vietnam Era Veterans Readjustment Act of 1974, as amended), each Contractor with a contract over $100,000 must take affirmative action to employ and advance in employment qualified special disabled veterans, recently separated veterans, veterans of the Vietnam Era, veterans who served on active duty in the Armed Forces during a war or in a campaign or expedition for which a campaign badge has been authorized; veterans who, while serving on active duty in the Armed Forces, participated in a United States military operation for which an Armed Forces Service Medal was awarded pursuant to Executive Order No. 12985; or other protected veterans, and list with appropriate local employment service offices all suitable employment openings.

The additional contract clauses prescribed in 41 CFR 60-741.5 and 60-300.5 are incorporated by reference into this Attachment.



## Certificate Of Completion

Envelope Id: 22B4A9A9E67F4D2CAD9A3A655BA92FB2  
Subject: XTO Energy Inc Goods and Services Agreement with Boomerang Tube  
Source Envelope:  
Document Pages: 16　　　　　　　　　　Signatures: 5　　　　　　　　　　Envelope Originator:  
Certificate Pages: 3　　　　　　　　　　Initials: 0　　　　　　　　　　　　Bianca Hessar-Amiri  
AutoNav: Enabled　　　　　　　　　　　　　　　　　　　　　　　　　　　Address Redacted  
EnvelopeId Stamping: Enabled　　　　　　　　　　　　　　　　　　　　　bianca_hessar-amiri@xtoenergy.com  
Time Zone: (UTC-06:00) Central Time (US & Canada)　　　　　　　　　　　IP Address: 158.26.2.166  

Status: Completed

## Record Tracking

Status: Original  
　　　　6/10/2019 4:21:48 PM  
Security Appliance Status: Connected  

Holder: Bianca Hessar-Amiri  
　　　　bianca_hessar-amiri@xtoenergy.com  
Pool: Security Pool  

Location: DocuSign

## Signer Events | Signature | Timestamp

**Kelly Hanlon**  
kelly.hanlon@boomerangtube.com  
Security Level: Email, Account Authentication (None)

*[Signature: Kelly Hanlon — 255DFD276F8A4ED...]*  

Signature Adoption: Pre-selected Style  
Using IP Address: 209.253.190.217  

Sent: 6/19/2019 10:28:40 AM  
Viewed: 6/20/2019 1:07:54 PM  
Signed: 6/20/2019 1:17:54 PM

**Electronic Record and Signature Disclosure:**  
　　Accepted: 6/20/2019 1:07:54 PM  
　　ID: fde1053e-5f0c-4e87-9455-6baea59a1178  
　　Company Name: ExxonMobil Production 10

**Anthony Landry**  
anthony_landry@xtoenergy.com  
Master Contracts Supervisor  
XTO Energy  
Security Level: Email, Account Authentication (None)

*[Signature — C58DB69567AB457...]*  

Signature Adoption: Uploaded Signature Image  
Using IP Address: 158.26.2.166  

Sent: 6/20/2019 1:17:57 PM  
Viewed: 6/20/2019 1:18:32 PM  
Signed: 6/20/2019 1:18:51 PM

**Electronic Record and Signature Disclosure:**  
　　Accepted: 2/13/2018 3:46:15 PM  
　　ID: 2073f5d5-e871-41cf-ae41-37e8e657a69e  
　　Company Name: ExxonMobil Production 10

## In Person Signer Events | Signature | Timestamp

## Editor Delivery Events | Status | Timestamp

## Agent Delivery Events | Status | Timestamp

## Intermediary Delivery Events | Status | Timestamp

## Certified Delivery Events | Status | Timestamp

## Carbon Copy Events | Status | Timestamp

**Larry Toomey**  
larry.toomey@boomerangtube.com  
Security Level: Email, Account Authentication (None)

**COPIED**

Sent: 6/19/2019 10:28:43 AM

**Electronic Record and Signature Disclosure:**

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Accepted: 4/12/2019 10:06:18 AM<br>ID: 28d1aac3-b2e4-4641-b4a2-59ef69f97cab<br>Company Name: ExxonMobil Production 10 | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 6/20/2019 1:17:57 PM |
| Certified Delivered | Security Checked | 6/20/2019 1:18:33 PM |
| Signing Complete | Security Checked | 6/20/2019 1:18:51 PM |
| Completed | Security Checked | 6/20/2019 1:18:51 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 12/30/2016 6:30:07 AM
Parties agreed to: Kelly Hanlon, Anthony Landry, Larry Toomey

Case 20-34879   Document 88-1   Filed in TXSB on 10/29/20   Page 20 of 20

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE** Exxon Mobil Corporation (ExxonMobil) [1] uses the DocuSign service to collect signatures, endorsements, and approvals for corporate purposes. DocuSign may be used by ExxonMobil to conduct corporate business endorsements and approvals or to gather electronic signatures from 3rd parties for business purposes. Please read the information below and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button.
**Acknowledging your access and consent to receive materials electronically** By checking the 'I agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and
- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference.
- I am authorized to do the specific type of work (approve, endorse, etc.) in the country where I am physically located when using DocuSign

**Getting paper copies** You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after signing the document.
**How to contact Exxon Mobil Corporation:** For email address changes or if you have questions about a document you receive please contact the sending ExxonMobil Business organization.
[1] ExxonMobil and/or ExxonMobil Affiliates mean (a) Exxon Mobil Corporation or any parent of Exxon Mobil Corporation, (b) any company or partnership in which Exxon Mobil Corporation or any parent of Exxon Mobil Corporation now or hereafter, directly or indirectly (1) owns or (2) controls, more than fifty per cent (50%) of the ownership interest having the right to vote or appoint its directors or functional equivalents ("Affiliated Company") and (c) any joint venture in which Exxon Mobil Corporations, any parent of Exxon Mobil Corporation or an Affiliated Company has day to day operational control.