# EXHIBIT K

CAUSE NO. _____

| | | |
|---|---|---|
| **BOOMERANG TUBE, LLC,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **HARRIS COUNTY, TEXAS** |
| **EAGLE PIPE, LLC,** | § | |
| **BEEMAC, INC., and** | § | |
| **JARED A. LIGHT,** | § | |
| | § | **\_\_\_\_\_ DISTRICT COURT** |
| **Defendants.** | § | |

## PLAINTIFF'S ORIGINAL PETITION, VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTION, AND REQUEST FOR DISCLOSURE

Eric D. Madden (State Bar No. 24013079)
D. Benjamin Thomas (State Bar No. 24099991)
REID COLLINS & TSAI LLP
1601 Elm Street, Suite 4200
Dallas, Texas 75201
T: (214) 420-8900
F: (214) 420-8909
emadden@reidcollins.com
bthomas@reidcollins.com

-and-

Clifford H. Walston (State Bar No. 24037666)
WALSTON BOWLIN LLP
4299 San Felipe, Suite 300
Houston, Texas 77027
T: (713) 300-8700
cliff@walstonbowlin.com

COUNSEL FOR PLAINTIFF,
BOOMERANG TUBE, LLC

BOOMERANG_10/30/20 HRG. EX._000061

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

PARTIES ............................................................................................................................. 2

    A.   Plaintiff. ................................................................................................................ 2

    B.   Defendants. ........................................................................................................... 2

    C.   Relevant Non-Party Entities. ............................................................................... 3

JURISDICTION AND VENUE ........................................................................................... 3

DISCOVERY CONTROL PLAN ........................................................................................ 4

STATEMENT OF FACTS ................................................................................................... 4

    A.   Boomerang Enters a Three-Party Agreement with Eagle and XTO to Supply
          OCTG for XTO's Use in Its Permian Basin Drilling Operations. ...................... 4

    B.   Boomerang Performs Its Obligations Under the Fastback Order,
          But XTO Decides to Cancel Deliveries After June 2020 ................................... 8

    C.   XTO Reneges on Its Commitment and Purports to Cancel Orders for OCTG
          That Had Already Been Delivered to XTO at the Beemac Yard and Atlas Yard. ........... 9

    D.   Boomerang and Eagle Agree That Eagle Will Transfer Possession and
          Any Rights to the Disputed Pipe to Boomerang in Exchange for the
          Cancellation of Boomerang's Outstanding Invoices. ....................................... 10

    E.   Eagle Breaches Its Obligations Under the Cancellation Agreement, and
          Beemac Refuses to Give Boomerang Possession of the Disputed Pipe. ........................ 14

    F.   Boomerang Loses Opportunities to Sell the Disputed Pipe Located at the
          Beemac Yard to Third Parties. ......................................................................... 15

    G.   Eagle Plans to Sell the Disputed Pipe Located at the Beemac Yard to Third Parties. .... 16

CAUSES OF ACTION ...................................................................................................... 16

    Count 1: Declaratory Judgment (Against Eagle and Beemac) ................................. 16

    Count 2: Breach of Contract (Against Eagle for Breach of the Fastback Order) .................... 18

    Count 3: Breach of Contract (Against Eagle for Breach of the Cancellation Agreement) ....... 18

    Count 4: Quantum Valebant (Against Eagle) ......................................................... 19

    Count 5: Breach of Contract (Against Beemac for Breach of the Bailee Agreement) ............ 19

    Count 6: Slander of Title (Against Eagle and Light) ............................................... 20

    Count 7: Conversion (Against Eagle and Beemac) ................................................. 21

APPLICATION FOR TEMPORARY RESTRAINING ORDER .......................................... 22

REQUEST FOR TEMPORARY INJUNCTION ................................................................. 23

REQUEST FOR DISCLOSURE ......................................................................................... 24

i

DEMAND FOR JURY TRIAL ................................................................................................. 24

PRAYER FOR RELIEF ........................................................................................................ 24

BOOMERANG_10/30/20 HRG. EX._000063

**PLAINTIFF'S ORIGINAL PETITION, VERIFIED APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND INJUNCTION,
AND REQUEST FOR DISCLOSURE**

Plaintiff Boomerang Tube, LLC ("Boomerang") hereby files this Original Petition, Verified Application for Temporary Restraining Order and Injunction, and Request for Disclosure against Defendants Eagle Pipe, LLC ("Eagle"), Beemac, Inc. ("Beemac"), and Jared A. Light ("Light"), and alleges as follows:

**INTRODUCTION**

1.       This case involves a three-party agreement between Boomerang, Eagle, and non-party XTO Energy Inc. ("XTO").  Under the agreement, Boomerang and Eagle agreed to supply XTO with large amounts of oil country tubular goods ("OCTG") on a regular basis throughout 2020.  Boomerang agreed to sell OCTG to Eagle, and Eagle agreed to sell that same OCTG to XTO by delivering it to drilling sites or placing it in a storage yard.  As relevant here, Eagle sold OCTG to XTO by delivering it to a storage yard operated by Beemac.

2.       After the onset of the recession caused by the COVID-19 pandemic, XTO attempted to trim costs by purportedly cancelling its agreement with Boomerang and Eagle.  By the time XTO purported to cancel the agreement, however, Boomerang had already delivered thousands of tons of OCTG to Eagle, and Eagle had delivered the same to XTO by placing it into storage at Beemac's storage yard.  Neither Eagle nor XTO have paid for the OCTG.

3.       Boomerang and Eagle attempted to mitigate the harm caused by XTO's purported cancellation by unwinding the initial product transfer between them.  In July 2020, in a written contract signed by both parties, Boomerang agreed to cancel its outstanding invoices to Eagle, and Eagle agreed to give up any title it had (if any) in the OCTG and return it to Boomerang.  Eagle also agreed to notify Beemac that the OCTG located at Beemac's storage yard belonged to Boomerang and was at Boomerang's disposal.

BOOMERANG_10/30/20 HRG. EX._000064

4.       Unfortunately, shortly after Eagle agreed to return the OCTG to Boomerang, Eagle "changed its mind."   It told Beemac not to transfer the inventory, and it refuses to pay the outstanding amounts due to Boomerang.   To make matters worse, Boomerang recently learned that Eagle is now trying to sell the OCTG located at Beemac's storage yard to third parties.

5.       Thus, this is a very simple case.  Eagle took OCTG worth no less than $5.3 million from Boomerang.  Eagle has not paid for it.  Eagle promised to give it back—in a signed contract— but later changed its mind.  As this Court knows, that is not how contracts work.  Boomerang asks this Court to provide the necessary and proper relief.

## PARTIES

**A.       Plaintiff.**

6.       Plaintiff Boomerang Tube, LLC is a limited liability company organized under the laws of Delaware, with its principal office in Chesterfield, Missouri.   Boomerang maintains manufacturing facilities in Houston and Liberty, Texas.

**B.       Defendants.**

7.       Defendant Eagle Pipe, LLC is a limited liability company organized under the laws of Texas, with its principal office in Houston, Texas.

8.       Defendant Beemac, Inc., f/k/a Beemac Trucking, LLC, is a corporation organized under the laws of Pennsylvania, with its principal office in Ambridge, Pennsylvania.  Beemac is a trucking, logistics and intermodal services company with facilities in several states.  As relevant here, Beemac maintains and operates a stocking yard and storage facility located at 2700 FM Road 307, Midland, Texas 79701 (the "Beemac Yard").

9.       Defendant Jared A. Light is the President of Eagle and resides in Harris County, Texas.

BOOMERANG_10/30/20 HRG. EX._000065

### C.    Relevant Non-Party Entities.

10.    Non-party XTO Energy Inc. is a corporation organized under the laws of Delaware, with its principal office in Fort Worth, Texas.  XTO is a major oil and gas operator in the Permian Basin region.  This dispute arises out of a three-party agreement between Boomerang, Eagle, and XTO, under which Boomerang agreed to sell OCTG to Eagle for ultimate delivery to XTO.  XTO intended to use the OCTG in drilling operations in the Permian Basin.

11.    Non-party Atlas Tubular LLC ("Atlas") is a limited liability company organized under the laws of Texas, with its principal office in Robstown, Texas.  Atlas provides OCTG-related services and, as relevant here, maintains and operates a storage facility located at 1710 S. Hwy. 77, Robstown, Texas 78380 (the "Atlas Yard").

### JURISDICTION AND VENUE

12.    The Court has subject matter jurisdiction over this action arising under Texas law. Boomerang seeks damages exceeding the minimum jurisdictional limits of this Court.

13.    The Court has personal jurisdiction over Eagle because it is organized under the laws of Texas and maintains its principal office in Houston, Texas.

14.    The Court has personal jurisdiction over Beemac, which maintains property and performs services on a systematic and regular basis in Texas, including in Harris County. Moreover, the Court has personal jurisdiction over Beemac under the Texas long-arm statute and federal and state due process standards because Beemac has purposefully availed itself of the privileges and benefits of conducting business activities in Texas.  Boomerang's claims arise out of and relate to actions or conduct Beemac engaged in at its stocking yard and storage facility in Midland, Texas.

15.    The Court has personal jurisdiction over Light because he is a Texas resident.

BOOMERANG_10/30/20 HRG. EX._000066

16.     Venue is proper in Harris County pursuant to Texas Civil Practice and Remedies Code §§ 15.002(a)(1) & (3) and 15.005.  A substantial part of the events giving rise to this claim occurred in Harris County, and Eagle's principal office is located in Harris County.  Specifically, Eagle entered into a contract to purchase goods manufactured, in part, in Harris County, and communicated with Boomerang and Beemac from its offices in Harris County.  Furthermore, Boomerang's claims against Eagle arise out of the same transactions, occurrences, and/or series of transactions or occurrences giving rise to Boomerang's claims against Beemac.

## DISCOVERY CONTROL PLAN

17.     Boomerang requests that discovery in this action be conducted pursuant to Discovery Control Plan Level 3.

## STATEMENT OF FACTS

**A.      Boomerang Enters a Three-Party Agreement with Eagle and XTO to Supply OCTG for XTO's Use in Its Permian Basin Drilling Operations.**

18.     In June and July 2019, Boomerang, Eagle, and XTO entered several agreements which, collectively, called for Boomerang and Eagle to supply XTO with approximately 120,000 tons of OCTG for XTO's use in its Permian Basin drilling operations in 2020.

19.     The first set of agreements were "Master Goods and Services Agreements" between Boomerang/Eagle and XTO.  On information and belief, XTO requires all its "Listed Affiliates" to execute its "Master Goods and Services Agreement," which is a form contract drafted by XTO for use with all its third-party suppliers.

20.     On or around June 20, 2019, Boomerang entered into a Master Goods and Services Agreement with XTO and several of its affiliates (together with the various documents incorporated by reference, as described below, the "Boomerang-XTO MGSA").  *See* Exhibit A-1. "The purpose of the Agreement" was "to provide terms and conditions to be incorporated into

BOOMERANG_10/30/20 HRG. EX._000067

orders, whether one or more, that may be issued by Purchaser for Goods or Services from Supplier ('Orders')." *Id.* § 4.

21.     The Boomerang-XTO MGSA incorporated additional "Articles, the General Terms and Conditions, the Attachments and any Order(s)." *Id.* §§ 4, 8.  These documents together "constitute[d] the entire agreement between Supplier and Purchaser concerning the subject matter" of the contract. *Id.* § 8.  The Boomerang-XTO MGSA defined "Purchaser" to refer to XTO and its affiliates, and "Supplier" to refer to Boomerang. *See id.* at Preamble.

22.     The Boomerang-XTO MGSA made clear that any amendment to the parties' Agreement had to be "agreed in writing by Purchaser and Supplier." *Id.* § 8.  Written Orders would "take precedence over the terms of th[e] Agreement only for purposes of that specific Order, and only," as relevant here, to "modify the general description of Goods or Services." *Id.*, General Terms and Conditions ("GTC") § 1(c).

23.     Thus, the Boomerang-XTO MGSA generally governed the terms of Boomerang and XTO's contractual agreement.  An Order would describe the kind and amount of goods required, the delivery date, etc., but it would not replace the terms of the Boomerang-XTO MGSA unless the parties agreed to a modification in writing.

24.     The Boomerang-XTO MGSA contained a few additional provisions that are relevant to this dispute.

25.     First, the Boomerang-XTO MGSA provided that, "[u]nless otherwise specified in an Order, title to any Goods provided under this Agreement will pass to Purchaser upon payment therefor by Purchaser or upon delivery to Purchaser's premises or other site designated by Purchaser, whichever occurs earlier." *Id.*, GTC § 4(c).

BOOMERANG_10/30/20 HRG. EX._000068

26.     Second, the Boomerang-XTO MGSA contained a cancelation clause, providing that, "[a]t any time after issuing an Order until the Goods are shipped, Purchaser may change or cancel the Order with respect to Goods." *Id.*, GTC § 7(b).

27.     Third, the Boomerang-XTO MGSA contained a provision defining a potential bailment arrangement between Boomerang and XTO.  *See id.*, GTC § 23.  Specifically, the bailment provision provided that, "[i]f Supplier or any subcontractor stores any of Purchaser's materials and/or equipment under one or more Orders," the parties "agree that delivery of Purchaser's materials and/or equipment is considered by both parties to be a bailment and not subject to the terms and conditions of the Uniform Commercial Code or similar law, as the same may be codified in applicable state law pertaining to sales and/or secured transactions." *Id.* Furthermore, the bailment provision requires that, where Boomerang holds Goods as a bailee for XTO, Boomerang "shall: (i) store such materials and/or equipment in a clean, dry, and secure location, unless otherwise agreed in writing by Purchaser, (ii) segregate such materials and/or equipment from items belonging to entities other than Purchaser, if the materials are of a nature which may be segregated, and (iii) mark, or otherwise indicate in a manner to make it evident to Supplier's creditors, that such materials and/or equipment belong to Purchaser." *Id.*

28.     On information and belief, Eagle entered into a Master Goods and Services Agreement with XTO (the "Eagle-XTO MGSA"), which contains substantially similar terms and provisions.

29.     The other agreement governing the three-party relationship between Boomerang, Eagle, and XTO was a July 9, 2019 "Pricing, Payments and Manufacturing Schedule" signed by each party (the "Fastback Order"), which was intended to document "the roles, expectations and

BOOMERANG_10/30/20 HRG. EX._000069

responsibilities" of each party "for the OCTG project supporting XTO's Permian Division 2020 drilling program." Exhibit A-2 at Preamble.

30.     Under the Fastback Order, Boomerang and Eagle agreed to supply XTO with OCTG according to the detailed terms spelled out in the Fastback Order and the attached Schedules A and B. *See id.* §§ 1-2. Moreover, the Fastback Order expressly stated that it was an "Order," and was thus "governed by the existing" Boomerang-XTO MGSA and Eagle-XTO MGSA. *Id.* § 4(f).

31.     The Fastback Order contemplated that Eagle would act as XTO's delegate to order and take delivery of OCTG, to pay Boomerang's invoices, and in some circumstances, to deliver the OCTG to a bailee, who would hold the OCTG until XTO needed it in the field. *See id.* §§ 2-3, 4(b)-(c).

32.     Specifically, XTO agreed to "timely communicate its OCTG delivery requirements to Eagle to allow Eagle to communicate purchase orders to Boomerang," *id.* § 2, and Eagle agreed to "promptly . . . place orders for OCTG with Boomerang in accordance with XTO's specifications," *id.* § 3.

33.     Next, Boomerang agreed to "sell the OCTG to Eagle for resale to XTO" at the agreed prices. *Id.* § 4(c).

34.     Then, acting as "primary distributor to XTO of OCTG manufactured by Boomerang," Eagle agreed to "provide logistics support for the shipment of OCTG from Boomerang to the storage yard designated by Eagle in its order." *Id.* § 3.

35.     Finally, Eagle was obligated to sell OCTG "to XTO at the prices set forth in Exhibit A" to the Fastback Order, *id.* § 4(c), "based on the schedule set forth in Exhibit B," *id.* § 4(b), and "all OCTG purchased by XTO as described" would "be delivered by Eagle FOB racks at Eagle's

7

designated yard," *id*.  XTO committed "to accept invoices from Eagle based on the schedule set forth in Exhibit B, whether by shipment of OCTG to rig locations or by rack transfer of inventory of OCTG to XTO."  *Id.* § 4(d).

36.     Exhibit A to the Fastback Order provided detailed price terms.  *See id.*, Ex. A. Exhibit B outlined a production and delivery schedule calling for Boomerang to supply Eagle/XTO with 120,000 tons of OCTG between November 2019 and December 2020.  *See id.*, Ex. B.

**B.     Boomerang Performs Its Obligations Under the Fastback Order, But XTO Decides to Cancel Deliveries After June 2020.**

37.     Boomerang began performing under the Fastback Order in compliance with purchase orders submitted to Boomerang by Eagle.  *See* Exhibit A-3.  By the end of March 2020, Boomerang had delivered approximately 35,000 tons of OCTG to Eagle.

38.     On April 2, 2020, XTO sent a "formal notice" to Boomerang and Eagle that XTO was "cancelling the remaining tonnage highlighted" in an attachment.  *See* Exhibit A-5. Nevertheless, XTO expressed its commitment to "utilizing the OCTG material that is in process of being manufactured and that is on the ground."  *Id.*  Read in combination with the highlighted attachment, the notice committed XTO to taking delivery of the approximately 32,000 tons of OCTG slated for delivery between April and June 2020.  *See id.*  But it canceled XTO's order for approximately 73,000 tons of OCTG that was slated for delivery between July and December 2020.  *See id.*

39.     In short, XTO agreed to pay for the approximately 70,000 tons of OCTG that had already been delivered or was scheduled for delivery by the end of June 2020 (the "Disputed Pipe").  But the remainder of the Fastback Order was canceled.

8

**C.     XTO Reneges on Its Commitment and Purports to Cancel Orders for OCTG That Had Already Been Delivered to XTO at the Beemac Yard and Atlas Yard.**

40.     Boomerang continued performing its contractual obligations regarding the Disputed Pipe.

41.     Pursuant to Eagle's instructions, the majority of the Disputed Pipe was shipped to the Beemac Yard.  Some of the Disputed Pipe was shipped to the Atlas Yard at Eagle's instruction.

42.     So long as the Disputed Pipe was delivered by Eagle to XTO pursuant to the Fastback Order, Schedule B, the "FOB racks" provision, *see* Exhibit A-2 § 4(b), dictated that title passed to XTO once the Disputed Pipe was placed into storage for XTO at the Beemac Yard and Atlas Yard.

43.     In other words, once title to the Disputed Pipe passed from Eagle to XTO under the FOB racks provision, XTO became a bailor and Beemac and Atlas, respectively, became bailees. From that time, Beemac and Atlas held the Disputed Pipe for XTO while awaiting XTO's instructions.

44.     Despite the fact that Boomerang and Eagle fully performed their delivery obligations regarding the Disputed Pipe, and passed both title and possession to XTO through XTO's bailee, Beemac and/or Atlas, XTO purported to "cancel" the Fastback Order, even for the Disputed Pipe.

45.     Specifically, on June 29, 2020, XTO sent a notice to Eagle that it was "cancelling the remaining material referenced" in an attached exhibit.  *See* Exhibit A-6.  The purported cancellation covered thousands of tons of OCTG that XTO had committed to "utilizing" in its April 2, 2020 letter, and that Boomerang/Eagle had already delivered to XTO.

BOOMERANG_10/30/20 HRG. EX._000072

46.     On information and belief, while XTO purported to "cancel" the Fastback Order, even for the Disputed Pipe, it never notified Beemac that it waived any right, title, or interest it had in the Disputed Pipe, and it never instructed Beemac to release the Disputed Pipe to Eagle.

**D.     Boomerang and Eagle Agree That Eagle Will Transfer Possession and Any Rights to the Disputed Pipe to Boomerang in Exchange for the Cancellation of Boomerang's Outstanding Invoices.**

47.     By the summer of 2020, the recession caused by the COVID-19 pandemic had inflicted severe damage on the oil and gas industry.  In particular, travel restrictions and other measures implemented to combat the spread of the virus caused a catastrophic decrease in demand for oil and gas products.

48.     Around this time, an XTO employee told a Boomerang employee that, as the COVID-19 crisis unfolded, XTO had sharply curtailed its drilling operations in the Permian Basin. Since XTO was not drilling in the Permian Basin as expected, the company decided to trim costs by refusing payment under the Fastback Order.

49.     XTO's gambit left Eagle with a surfeit of inventory and no way to pay for it. Moreover, on information and belief, the decreased drilling activity caused by the COVID-19 pandemic has severely harmed Eagle's business overall, and various actions by Eagle and various statements by its employees in the late summer and early fall of 2020 suggest that Eagle may be on the brink of insolvency.

50.     Accordingly, while Eagle appears to have strong breach of contract claims against XTO, Eagle decided to treat the Disputed Pipe as if it had never been delivered to XTO, and to attempt to work out a deal with Boomerang to unwind their previous arrangement.

51.     While Beemac might have objected to Eagle's actions and asserted XTO's right to the Disputed Pipe, Eagle is Beemac's sole customer at the Beemac Yard.  Thus, Eagle has significant influence over Beemac.  And since XTO had refused to acknowledge its title to and

BOOMERANG_10/30/20 HRG. EX._000073

possession of the Disputed Pipe, Beemac has no interest in crossing Eagle in order to protect XTO's valid claims to the Disputed Pipe.

52. By late June 2020, Eagle had past due balances on multiple Boomerang invoices covering the Disputed Pipe.

53. On the morning of July 1, 2020, Boomerang held a videoconference with Eagle to discuss payment on outstanding invoices. The parties discussed the possibility of Eagle returning the Disputed Pipe to Boomerang.

54. Later the same day, Eagle's president, Light, emailed a list of OCTG that Eagle proposed to return to Boomerang. Light included on the list Disputed Pipe stored at the Beemac Yard and Atlas Yard.

55. On July 2, 2020, a Boomerang employee emailed Light asking, "Can you please send us the names and contact info for the different yards where pipe is located? We would like to reach out and get started on the agreements with each of them as soon as possible." On information and belief, the "agreements" mentioned in this email were bailment agreements specifying that the Disputed Pipe was being stored by Beemac/Atlas as bailees for Boomerang.

56. Just a few minutes later, at 7:05 a.m., Light responded: "I'm thinking we should start with the big chunks first which should be at [A]tlas and Beemac. Will get them all going today though . . . . I'll email them with y'all in copy letting them know what's going on so y'all can get started."

57. At 7:07 a.m., Light emailed several Beemac and Boomerang employees: "Beemac, we are going to be getting some pipe transferred from our name and into Boomerangs [sic] name at your yard. Can you please work with the folks from boomerang [sic] that are attached here so y'all can get them set up in your system?" Exhibit A-7.

11

58.     At 7:08 a.m., Light sent a nearly identical email to Mark Mitchell, an Atlas manager, copying other Boomerang and Atlas employees: "Mark, we are going to be getting some pipe transferred from our name and into Boomerangs [sic] name at your yard.  Can you please work with the folks from boomerang [sic] that are attached here so y'all can get them set up in your system?"

59.     Over the next several days, Boomerang and Eagle employees worked to identify the Disputed Pipe at the Beemac Yard and Atlas Yard that would be transferred to Boomerang.

60.     On July 6, 2020, Eagle identified specific OCTG located at the Atlas Yard that Eagle wanted Atlas to transfer to Boomerang.  That transfer was completed, and Boomerang now has unchallenged possession of the Disputed Pipe located that was at the Atlas Yard.

61.     On July 7, 2020, Eagle identified specific OCTG located at the Beemac Yard that Eagle wanted Beemac to transfer to Boomerang.   An Eagle employee named Jamie Secrest ("Secrest") emailed a Beemac Yard employee named Hector Martinez ("Martinez"), as well as several other Eagle and Boomerang employees stating: "[W]e need the following transferred from Eagle Pipe's stock to Boomerang Tube. I know Hector is performing a physical count and should be complete by tomorrow, but we need this today."  Exhibit A-8.

62.     Martinez immediately responded: "Received and [u]nderstood[.]  Will get this [t]ransferred right now."  *Id.*

63.     Additionally, on or around July 7, 2020, both Beemac and Eagle signed separate contracts acknowledging Boomerang's ownership of the Disputed Pipe.

64.     Beemac signed a Bailee Agreement with Boomerang, which was backdated to December 31, 2019 (the "Bailee Agreement").  *See* Exhibit A-9.  In the Bailee Agreement, Beemac acknowledged that it was holding inventory on behalf of Boomerang "as a bailment . . . for the

BOOMERANG_10/30/20 HRG. EX._000075

sole and express purpose of processing, transporting, storing, warehousing or handling the Materials" according to Boomerang's instructions. *Id.* While the Bailee Agreement does not specify the exact "Materials" being held for Boomerang, a detailed description of the "Materials" was contained in Secrest's July 7, 2020 email. *See* Exhibit A-8.

65.     Eagle signed a Cancellation of Sales Agreement with Boomerang dated July 8, 2020 (the "Cancellation Agreement"). *See* Exhibit A-10; *see also* Exhibit A ¶ 24 (stating that Eagle executed the Cancellation Agreement on July 7, 2020). The Cancellation Agreement identifies the Disputed Pipe according to specific purchase orders as well as other specifications, which the Cancellation Agreement defines as "Specified Inventory." *See* Exhibit A-10. And it provides that, in exchange for Boomerang's cancelling "Specified Invoices," "**Eagle hereby returns the Specified Inventory to Boomerang and transfers any and all, if any, of its right, title and interest in the Specified Inventory to Boomerang, free and clear of all liens and encumbrances of any kind arising by or through Eagle.**" *Id.* § 2 (emphasis added).

66.     The Cancellation Agreement further provides: "**Eagle will notify in writing (including e-mail) each third party bailee holding, storing or otherwise in possession of any of the Specified Inventory, that such inventory has been returned and is owned by Boomerang, to be held by such third party for the benefit of and at the direction of Boomerang.**" *Id.* (emphasis added).

67.     Finally, the Cancellation Agreement provides that the parties will "take any and all further actions" that either party "may from time to time reasonably request, in order to effectuate the transaction contemplated by this Agreement." *Id.* § 6.

BOOMERANG_10/30/20 HRG. EX._000076

**E.      Eagle Breaches Its Obligations Under the Cancellation Agreement, and Beemac Refuses to Give Boomerang Possession of the Disputed Pipe.**

68.      As noted above, Eagle satisfied its obligations to Boomerang under the Cancellation Agreement regarding the Disputed Pipe located at the Atlas Yard.

69.      Unbeknownst to Boomerang, however, shortly after Eagle signed the Cancellation Agreement, Eagle breached its obligations and instructed Beemac not to release the Disputed Pipe located at the Beemac Yard.

70.      Specifically, on information and belief, on or around July 8, 2020, Light called Beemac's Chief Operating Officer, Richard Casoli ("Casoli"), and told him that Eagle had "changed its mind."  Exhibit A ¶ 26.  Light instructed Casoli not to release the Disputed Pipe located at the Beemac Yard to Boomerang.  *See id.*

71.      As stated above, Eagle is Beemac's sole customer at the Beemac Yard.  Thus, Eagle has the practical ability to control Beemac since Beemac cannot afford to disobey its sole customer's instructions, even though the instructions obviously violate the Cancellation Agreement and the Bailee Agreement.

72.      Thus, since Martinez confirmed that he was transferring the Disputed Pipe to Boomerang on July 7, 2020, *see* Exhibit A-8, both Eagle and Beemac have refused to acknowledge Boomerang's right to immediate possession of the Disputed Pipe located at the Beemac Yard.

73.      On August 18, 2020, Boomerang sent Eagle a letter, demanding that Eagle immediately notify Beemac in writing "of the transfer of the Specified Inventory to Boomerang and provide a copy of such correspondence to Boomerang."  Exhibit A-12.

74.      Eagle ignored the demand letter and still refuses to instruct Beemac regarding Boomerang's right to possess the Disputed Pipe located at the Beemac Yard.  Beemac also refuses to acknowledge Boomerang's right to possession.

14

75.     Additionally, Eagle still has not paid Boomerang's invoices regarding the Disputed Pipe located at the Beemac Yard.  As of the date of this filing, Eagle owes Boomerang no less than $5.3 million under those invoices.  *See* <u>Exhibit A</u> ¶ 11; <u>Exhibit A-4</u>.

**F.     Boomerang Loses Opportunities to Sell the Disputed Pipe Located at the Beemac Yard to Third Parties.**

76.     Since Eagle has never paid Boomerang's invoices regarding the Disputed Pipe located at the Beemac Yard—and it has given no indication that it ever intends to—Boomerang has sought other customers interested in buying the Disputed Pipe located at both the Beemac Yard and Atlas Yard.

77.     Regarding the Disputed Pipe located at the Atlas Yard, Boomerang has already been able to identify a paying customer—B&L Pipeco Services, Inc. ("<u>B&L Pipeco</u>")—for some of the inventory.  While the sale to B&L Pipeco was at a discounted rate, the sale allowed Boomerang to recoup at least some of the losses caused by XTO's purported cancellation.

78.     And because Eagle and Atlas honored their agreements with Boomerang regarding possession of the inventory, Boomerang has been able to move all of the Disputed Pipe from the Atlas Yard to other locations, either to B&L Pipeco or to storage at other yards.

79.     Regarding the Disputed Pipe located at the Beemac Yard, however, Boomerang has been unable to finalize sales contracts with third parties because of Eagle and Beemac's refusal to honor their agreements.

80.     For example, Boomerang reached an agreement with B&L Pipeco to sell some of the Disputed Pipe located at the Beemac Yard (again, at discounted rates).  And Boomerang has had discussions with several other customers who indicated their interest in purchasing the Disputed Pipe on mutually agreeable terms.

BOOMERANG_10/30/20 HRG. EX._000078

81. Nevertheless, because Eagle and Beemac are now refusing to honor their agreements, each potential customer has walked away from the deal. Instead of filling the B&L Pipeco order with the Disputed Pipe located at the Beemac Yard, Boomerang was forced to manufacture new OCTG at significant expense. The other customers have walked away from the potential deals since Eagle and Beemac are blocking Boomerang's access to the Disputed Pipe located at the Beemac Yard.

**G.     Eagle Plans to Sell the Disputed Pipe Located at the Beemac Yard to Third Parties.**

82. While refusing to acknowledge Boomerang's right to immediate possession of the Disputed Pipe located at the Beemac Yard, on information and belief, Eagle is making plans to sell it to third parties.

83. Specifically, on September 18, 2020, Eagle asked Boomerang to forward mill inspection reports regarding some of the Disputed Pipe in response to a "request [Eagle] received." Exhibit A-13; *see also* Exhibit A ¶¶ 31-32. In the industry, obtaining mill inspection reports is often one of the last steps prior to a sale since buyers want to make sure the specific product they will receive meets their specifications. *See* Exhibit A ¶ 33.

84. Thus, on information and belief, Eagle intends to take possession of the Disputed Pipe located at the Beemac Yard, Beemac intends to wrongfully give Eagle possession, and Eagle is planning to sell some or all of the Disputed Pipe to third parties.

**CAUSES OF ACTION**

**Count 1**
**Declaratory Judgment**
**(Against Eagle and Beemac)**

85. Boomerang repeats and re-alleges the allegations set forth in all proceeding paragraphs of this Original Petition as if fully set forth herein.

BOOMERANG_10/30/20 HRG. EX._000079

86.     Pursuant to Texas Civil Practice and Remedies Code § 37.003, Boomerang requests that this Court construe certain provisions of contracts between Boomerang and Eagle, and Boomerang and Beemac, to determine their respective rights, obligations, and liabilities under the contracts.  Specifically, Boomerang requests that the Court declare that: (i) Eagle has an immediate obligation to notify Beemac in writing that the Disputed Pipe has been returned to and is owned by Boomerang, and is to be held by Beemac for the benefit of and at the direction of Boomerang; (ii) that Boomerang has the right to immediate possession of the Disputed Pipe and/or a superior right to possession as compared to Eagle or Beemac; and (iii) that Beemac is holding the Disputed Pipe on Boomerang's behalf as bailee.  The relevant contracts were freely entered into by Boomerang, Eagle, and Beemac, and they are supported by valuable consideration.  All conditions precedent have been performed by Boomerang or have occurred.

87.     By granting the declaratory relief sought by Boomerang, this Court will clarify an ongoing and continuing dispute as to the parties' rights, obligations, and liabilities under the relevant contracts.

88.     Boomerang has incurred costs and reasonable and necessary attorney's fees in seeking this declaratory judgment.  Accordingly, Boomerang seeks declaratory relief stating that: (i) Eagle has an immediate obligation to notify Beemac in writing that the Disputed Pipe has been returned to and/or is owned by Boomerang, and is to be held by Beemac for the benefit of and at the direction of Boomerang; (ii) that Boomerang has the right to possession of the Disputed Pipe and/or a superior right to possession as compared to Eagle or Beemac; and (iii) that Beemac is holding the Disputed Pipe on Boomerang's behalf as bailee.  Additionally, Boomerang seeks recovery of its costs and attorney's fees pursuant to Texas Civil Practice and Remedies Code § 37.009.

17

**Count 2**
**Breach of Contract**
**(Against Eagle for Breach of the Fastback Order)**

89.     Boomerang repeats and re-alleges the allegations set forth in all proceeding paragraphs of this Original Petition as if fully set forth herein.

90.     Boomerang and Eagle are parties to the Fastback Order.

91.     Boomerang complied with all terms and conditions of the Fastback Order regarding Boomerang's sale of goods to Eagle, and all conditions precedent have been performed by Boomerang.

92.     Eagle had various duties and obligations under the Fastback Order, including but not limited to, the obligation to pay for the goods identified in the invoices listed in the Accounts Receivable Aging Report, which is attached hereto as Exhibit A-5.

93.     Eagle has failed to perform its obligations under the Fastback Order in that, among other things, Eagle has failed to pay these invoices.

94.     As a result of Eagle's breach of its contractual obligations, Boomerang has suffered damages in an amount to be proven at trial.

**Count 3**
**Breach of Contract**
**(Against Eagle for Breach of the Cancellation Agreement)**

95.     Boomerang repeats and re-alleges the allegations set forth in all proceeding paragraphs of this Original Petition as if fully set forth herein.

96.     Boomerang and Eagle are parties to the Cancellation Agreement.

97.     All conditions precedent to the Cancellation Agreement have been performed by Boomerang.

98.     Eagle has failed to perform its obligations under the Cancellation Agreement in that, among other things, Eagle continues to claim title and/or the right to possession of the

BOOMERANG_10/30/20 HRG. EX._000081

Disputed Pipe located at the Beemac Yard and refuses to notify Beemac in writing that the Disputed Pipe located at the Beemac Yard has been returned to and is owned by Boomerang.

99.     As a result of Eagle's breach of its contractual obligations, Boomerang has suffered damages in an amount to be proven at trial.

## Count 4
### Quantum Valebant
### (Against Eagle)

100.     Boomerang repeats and re-alleges the allegations set forth in all proceeding paragraphs of this Original Petition as if fully set forth herein.

101.     Boomerang furnished to Eagle the Disputed Pipe that is now located at the Beemac Yard.

102.     Eagle accepted these goods with full knowledge that Boomerang, in delivering these goods, expected to be paid by Eagle and/or XTO.

103.     As a result of Eagle's refusal to pay, Boomerang has suffered damages in an amount to be proven at trial.

## Count 5
### Breach of Contract
### (Against Beemac for Breach of the Bailee Agreement)

104.     Boomerang repeats and re-alleges the allegations set forth in all proceeding paragraphs of this Original Petition as if fully set forth herein.

105.     Boomerang and Beemac entered into the Bailee Agreement, pursuant to which Beemac agreed to store the Disputed Pipe on behalf of Boomerang.

106.     All conditions precedent to the Bailee Agreement have been performed by Boomerang.

BOOMERANG_10/30/20 HRG. EX._000082

107.    Beemac has failed to perform its obligations under the Bailee Agreement in that, among other things, Beemac refuses to acknowledge that it holds the Disputed Pipe on behalf of Boomerang or to comply with Boomerang's instructions.

108.    As a result of Beemac's breach of its contractual obligations, Boomerang has suffered damages in an amount to be proven at trial.  Boomerang is also entitled to its attorney's fees and costs pursuant to Texas Civil Practice and Remedies Code § 38.001 *et seq.*

### Count 6
### Slander of Title
### (Against Eagle and Light)

109.    Boomerang repeats and re-alleges the allegations set forth in all proceeding paragraphs of this Original Petition as if fully set forth herein.

110.    Boomerang possessed property in the form of the right to immediate possession and/or title in the Disputed Pipe located at the Beemac Yard.  Boomerang has sought to obtain possession and/or title to the same, but it has been unable to because of Eagle and Light's instructions to Beemac not to release the Disputed Pipe to Boomerang.

111.    Eagle and Light uttered and published disparaging statements about the state of Boomerang's right to immediate possession and/or title to the Disputed Pipe located at the Beemac Yard.

112.    Eagle and Light's statements were false because Eagle has purposefully and expressly surrendered "any and all, if any, of its right, title and interest in" the Disputed Pipe, "free and clear of all liens and encumbrances of any kind."

113.    Eagle and Light's false statements caused injury to Boomerang, which resulted in the loss of specific sales of the Disputed Pipe located at the Beemac Yard, which were frustrated by Eagle and Light's slander, and Boomerang's ensuing inability to obtain immediate possession of the Disputed Pipe.

BOOMERANG_10/30/20 HRG. EX._000083

114.    Eagle and Light's false statements were published with legal malice, which entitles Boomerang to actual and punitive damages.  Specifically, Eagle and Light signed the Cancellation Agreement.  Thus, they had actual knowledge that their statements disputing Boomerang's title and/or right to possess the Disputed Pipe were false.

115.    Eagle and Light also knew that their false statements would cause injury to Boomerang, both by making it impossible for Boomerang to sell the Disputed Pipe to paying customers, and by potentially allowing Eagle to sell the Disputed Pipe to third parties in order to pocket the proceeds.

**Count 7**
**Conversion**
**(Against Eagle and Beemac)**

116.    Boomerang repeats and re-alleges the allegations set forth in all proceeding paragraphs of this Original Petition as if fully set forth herein.

117.    Eagle and Beemac have wrongfully taken and deprived Boomerang of lawful possession to the Disputed Pipe located at the Beemac Yard and have converted it for their own use.  The property was converted without Boomerang's knowledge or consent.

118.    At the time of the conversion, Boomerang was the lawful owner of the converted property and/or had the right to possession of the same.

119.    Eagle, conversely, had no right or title to, or interest in, the property, and has wholly failed to compensate Boomerang for the property.  Similarly, Beemac had no right to deny Boomerang's right to possess the property and has failed to compensate Boomerang for the same.

120.    Boomerang has been damaged as the result of Eagle and/or Beemac's conversion.  Specifically, Boomerang is in danger of losing and/or has lost business opportunities to sell the Disputed Pipe to a party willing to pay for it.

BOOMERANG_10/30/20 HRG. EX._000084

## APPLICATION FOR TEMPORARY RESTRAINING ORDER

121.    Boomerang repeats and re-alleges the allegations set forth in all proceeding paragraphs of this Original Petition as if fully set forth herein.

122.    Boomerang's application for a temporary restraining order is authorized by Texas Civil Practice and Remedies Code § 65.011(1) and (2).

123.    Boomerang is willing and able to post bond.

124.    As explained above, after title to the Disputed Pipe located at the Beemac Yard passed to XTO, Beemac held the Disputed Pipe as XTO's bailee.  Moreover, on information and belief, as of June 29, 2020, when XTO sent Eagle a formal notice purporting to cancel the Fastback Order, even as to OCTG already delivered, XTO had already (i) accepted the Disputed Pipe, and (ii) failed to timely notify Eagle of any purported right of revocation.  Beemac has no right to deliver possession of the Disputed Pipe to Eagle, and Eagle has no right either to possess the Disputed Pipe or sell it to third parties.

125.    Additionally, regardless whether Eagle had the right to possess the Disputed Pipe after receipt of XTO's June 29, 2020 cancellation notice, Eagle gave up any and all such rights through the Cancellation Agreement.  And through the contemporaneous communications of the parties and the Bailee Agreement, Beemac acknowledged Boomerang's right to possess the Disputed Pipe located at Beemac Yard.

126.    Accordingly, unless this Court enjoins any shipment, sale, or other transfer of the Disputed Pipe located at the Beemac Yard, or of any proceeds already obtained from such transfers, Boomerang will suffer material, irreparable financial harm.

127.    It is probable that Boomerang will prevail on its declaratory judgment and other claims against Eagle and Beemac.  The Cancellation Agreement and Bailee Agreement clearly and unmistakably show that Eagle has no right to possess the Disputed Pipe located at the Beemac

BOOMERANG_10/30/20 HRG. EX._000085

Yard, and that Beemac holds the Disputed Pipe as Boomerang's bailee and has no right or obligation to comply with Eagle's instructions regarding the Disputed Pipe.

128.    If Boomerang's application is not granted, harm is imminent.  If Eagle completes the planned sales of the Disputed Pipe located at the Beemac Yard, it will be impossible to return the parties to the status quo.

129.    A temporary restraining order will preserve the status quo until this Court rules on Boomerang's request for declaratory judgment.

130.    Boomerang has no adequate remedy at law because, without injunctive or declaratory relief, Boomerang cannot prevent (i) Eagle from wrongfully taking possession of the Disputed Pipe, (ii) Beemac from wrongfully giving Eagle possession of the Disputed Pipe, or (iii) Eagle from delivering Disputed Pipe located at the Beemac Yard to third parties.

131.    For the foregoing reasons, Boomerang requests that this Court immediately issue a temporary restraining order enjoining Eagle and/or Beemac from: (i) selling or attempting to sell any of the Disputed Pipe located at the Beemac Yard to any third party; (ii) removing any of the Disputed Pipe from the Beemac Yard; and (iii) transferring any proceeds from sales of the Disputed Pipe located at the Beemac Yard to Eagle or any other third party.

## REQUEST FOR TEMPORARY INJUNCTION

132.    Boomerang asks the Court to set its request for temporary injunction for a hearing.

133.    After a hearing on this issue, Boomerang asks the Court to maintain the relief requested in the Application for Temporary Restraining Order, namely the relief sought in paragraph 131 above.

134.    Additionally, Boomerang asks the Court to: (i) order Eagle to comply with its contractual duty to notify Beemac that the Disputed Pipe located at the Beemac Yard has been returned to and is owned by Boomerang, to be held by Beemac for the benefit and at the direction

23

of Boomerang; and (ii) order Beemac to acknowledge Boomerang's right to possession of the Disputed Pipe located at the Beemac Yard and to comply with Boomerang's lawful instructions regarding the same.

## REQUEST FOR DISCLOSURE

Pursuant to Texas Rule of Civil Procedure 194, Boomerang requests that each of the Defendants disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## DEMAND FOR JURY TRIAL

Boomerang demands a jury trial and tenders the appropriate fee with this Original Petition.

## PRAYER FOR RELIEF

For all the foregoing reasons, Boomerang respectfully requests that Eagle, Beemac, and Light be cited to appear and answer herein, and that the Court:

a.  Award Boomerang all compensatory, incidental, consequential, and/or monetary damages, along with exemplary and/or punitive damages, in an amount to be determined by a jury;

b.  Without notice to Defendants, issue a temporary restraining order restraining Defendants, their officers, agents, servants, employees, and any person acting in concert with them, who receive notice of the temporary restraining order, from:

  i.  Selling or attempting to sell any of the Disputed Pipe located at the Beemac Yard to any third party;

  ii.  Removing any of the Disputed Pipe from the Beemac Yard;

  iii.  Transferring any proceeds from sales of the Disputed Pipe located at the Beemac Yard to Eagle or any third party;

c.  Set a date and time for a hearing on this application for a temporary injunction;

d.  After a hearing, issue a temporary injunction:

  i.  Enjoining Defendants, their officers, agents, servants, employees, and any person acting in concert with them, who receive notice of the temporary restraining order, from selling or attempting to sell any of the Disputed Pipe located at the Beemac Yard to any third

BOOMERANG_10/30/20 HRG. EX._000087

party, removing any of the Disputed Pipe from the Beemac Yard, or transferring any proceeds from sales of the Disputed Pipe located at the Beemac Yard to Eagle or any third party;

ii.    Requiring Eagle to comply with its contractual duty to notify Beemac that the Disputed Pipe located at the Beemac Yard has been returned to and is owned by Boomerang, to be held by Beemac for the benefit and at the direction of Boomerang;

iii.    Requiring Beemac to acknowledge Boomerang's right to possession of the Disputed Pipe located at the Beemac Yard and to comply with Boomerang's lawful instructions regarding the same;

e.    Award Boomerang reasonable and necessary attorney's fees and costs pursuant to sections 37.009 and/or 38.001 of the Texas Civil Practice and Remedies Code;

f.    Award Boomerang pre-judgment interest and post-judgment interest at the highest rates allowed by law or equity; and

g.    Award Boomerang such other and further relief, at law or in equity, as this Court deems just and proper.

BOOMERANG_10/30/20 HRG. EX._000088

Dated: October 1, 2020

Respectfully submitted,

REID COLLINS & TSAI LLP

*/s/ D. Benjamin Thomas*
Eric D. Madden (State Bar No. 24013079)
D. Benjamin Thomas (State Bar No. 24099991)
REID COLLINS & TSAI LLP
1601 Elm Street, Suite 4200
Dallas, Texas 75201
T: (214) 420-8900
F: (214) 420-8909
emadden@reidcollins.com
bthomas@reidcollins.com

-and-

Clifford H. Walston (State Bar No. 24037666)
WALSTON BOWLIN LLP
4299 San Felipe, Suite 300
Houston, Texas 77027
T: (713) 300-8700
cliff@walstonbowlin.com

COUNSEL FOR PLAINTIFF,
BOOMERANG TUBE, LLC

BOOMERANG_10/30/20 HRG. EX._000089

## VERIFICATION

My name is Robert Horsfield. My date of birth is May 2, 1955. My office address is 14567 North Outer Forty, Chesterfield MO 63017.

I am the Vice President & Chief Financial Officer for Plaintiff Boomerang Tube, LLC ("Boomerang"), and I am duly authorized to make this verification on behalf of Boomerang.

I declare under penalty of perjury that I have read the foregoing Original Petition, Verified Application for Temporary Restraining Order and Injunction, and Request for Disclosure, and that, except for those statements made on information and belief, the statements contained therein are true and correct and within my personal knowledge.

Executed in St Louis County, State of Missouri, on the 1st day of October, 2020.

Robert Horsfield